UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------X
NEW YORK LEGAL ASSISTANCE GROUP,        :
                                        :
                        Plaintiff,      :
                                        :            20 Civ. 1414 (LGS)
          -against-                     :
                                        :            OPINION & ORDER
ELISABETH DeVOS, in her official capacity as  :
Secretary of Education, and UNITED STATES :
DEPARTMENT OF EDUCATION,                 :
                        Defendants.     :
-------------------------------------------------------------X
```

LORNA G. SCHOFIELD, District Judge:

Plaintiff New York Legal Assistance Group ("NYLAG") moves for summary judgment

on its challenges to regulations promulgated by the United States Department of Education

concerning defenses student borrowers may raise against the repayment of federal student loans.

Defendants Elisabeth DeVos, in her official capacity as Secretary of Education (the "Secretary"),

and the Department of Education (collectively, "ED") cross-move for summary judgment. For

the reasons stated below, summary judgment is granted to Plaintiff on its claim that the statute of

limitations on defensive borrower claims in the challenged rule is not a logical outgrowth of the

proposed rulemaking. Summary judgment is granted to ED on the other claims.

## I. BACKGROUND

The following facts are undisputed. ED distributes federal student loans via Title IV of

the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 et seq. Most of that funding is

through the William D. Ford Federal Direct Loan Program (the "Direct Loan Program"),

whereby ED provides federal loans directly to eligible students who attend participating

institutions of higher education. 20 U.S.C. § 1087a. The HEA requires ED to "specify in

regulations which acts or omissions of an institution of higher education a borrower may assert

as a defense to repayment of a loan made under [the HEA]." 20 U.S.C. § 1087e(h).

In 1994, ED first implemented regulations governing student-borrower defenses to repayment. Those regulations permitted borrowers to "assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." The 1994 Regulations did not specify a process by which a student could assert a borrower defense claim.

In May 2015, an investigation revealed that Corinthian Colleges, Inc. -- a large nationwide for-profit school operator -- had misrepresented job placement rates to students, eventually leading to bankruptcy for Corinthian's constituent schools. The collapse led to thousands of borrower defense claims filed with ED. Noting that these claims highlighted difficulties with the State law standard of the 1994 Regulations, ED began a negotiated rulemaking process on the topic of borrower defenses. ED published final regulations on November 1, 2016 (the "2016 Rule"). The 2016 Rule was scheduled to go into effect on July 1, 2017. In May 2017, the California Association of Private Postsecondary Schools ("CAPPS") challenged the 2016 Rule in the United States District Court for the District of Columbia. *See California Ass'n of Private Postsecondary Schs. v. DeVos*, No. 17 Civ. 00999 (D.D.C. May 24, 2017). In June 2017, ED published a notification of delay of the July 1, 2017, effective date pursuant to Administrative Procedure Act ("APA") Section 705, pending resolution of the judicial challenge to the 2016 Rule (the "705 Notice"). The 705 Notice stated that ED would review and revise the 2016 Rule through the negotiated rulemaking process mandated by HEA Section 492.

In October 2017, ED issued an interim final rule delaying the 2016 Rule's effective date until July 1, 2018, (the "Interim Final Rule") and issued a notice of proposed rulemaking

("NPRM") to further delay the effective date to July 1, 2019. In February 2018, ED published a final rule delaying the effective date to July 1, 2019 (the "Final Delay Rule").

Two plaintiffs and the attorneys general of eighteen States and the District of Columbia filed complaints challenging the validity of the 705 Notice, the Interim Final Rule and the Final Delay Rule. Those claims were consolidated before the United States District Court for the District of Columbia. *See Bauer v. DeVos*, 325 F. Supp. 3d 74, 79 (D.D.C. 2018).

In November 2017, ED began a second negotiated rulemaking process (the "2018 Negotiated Rulemaking") related to student borrowing. Following negotiation sessions with industry and student representatives, on July 31, 2018, ED published an NPRM addressing borrower defenses (the "2018 NPRM") and requested public comments on or before August 30, 2018. The 2018 Negotiated Rulemaking and 2018 NPRM (together, the "2018 Rulemaking") used the 1994 Regulations, which were in effect at the time the 2018 NPRM was first published, as the basis for proposed regulatory amendments.

In September 2018, the court in *Bauer* granted the plaintiffs' motion for summary judgment, vacated the Final Delay Rule and 705 Notice, but temporarily stayed vacatur of the 705 Notice. *See Bauer*, 325 F. Supp. 3d at 110 and *Bauer v. DeVos*, 332 F. Supp. 3d 181, 186 (D.D.C. 2018). The stay expired on October 16, 2018, and the 2016 Rule went into effect.

On September 23, 2019, ED published final regulations amending the borrower defense regulations pursuant to the 2018 NPRM. Although the 2018 NPRM was premised on changes to the 1994 Regulations, ED stated that "these final regulations, as a technical matter, amend the 2016 final regulations which have since taken effect" (the "2019 Rule").

Plaintiff filed suit alleging procedural defects in the 2018 Rulemaking and 2019 Rule under the HEA and APA: that (1) the 2018 Negotiated Rulemaking failed to comply with the

HEA's requirement of public consultation and negotiated rulemaking; (2) the APA's notice and comment requirement was violated because the 2018 Rulemaking was not reinitiated or reopened when the 2016 Rule went into effect and (3) the 2019 Rule violated the APA by including a three-year statute of limitations on certain borrower defense claims that was not a logical outgrowth of the 2018 NPRM. Plaintiff also alleges that various changes to provisions of the 2019 Rule involving borrower defenses were arbitrary and capricious, in violation of the APA. The parties cross-moved for summary judgment on these claims.

## II.    STANDARD

Where a party seeks review of agency action under the APA, "the entire case on review is a question of law." *Seife v. U.S. Dep't of Health & Human Servs.*, 440 F. Supp. 3d 254, 271 (S.D.N.Y. 2020) (internal citation omitted) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).[1] "While the usual summary judgment standard under Federal Rule of Civil Procedure 56 does not apply in such cases, summary judgment [as a remedy] nonetheless is 'generally appropriate' because courts 'address legal questions in deciding whether the agency acted arbitrarily, capriciously or in some other way that violates'" the APA. *Id.* (internal citations omitted) (quoting *Thompson*, 269 F.3d at 1083); *see also Aleutian Capital Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020) (citing *Thompson*, 269 F.3d at 1083-84). Courts addressing the propriety of agency action during negotiated rulemaking under the HEA have likewise applied the analogous standards of the APA to the HEA's negotiated rulemaking requirements. *See, e.g.*, *Bauer*, 325 F. Supp. 3d at 97 (D.D.C. 2018).

---

[1] This Opinion and Order cites binding Second Circuit authority where available. In the absence of Second Circuit authority, it cites persuasive authority from the D.C. Circuit addressing review of agency action, as well as courts nationwide addressing negotiated rulemaking under the HEA.

III.    **DISCUSSION**

  A.  **Procedural Arguments**

    1.  **Public Consultation and Negotiated Rulemaking Under the HEA**

ED enjoys broad authority "to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department."  20 U.S.C. § 1221e–3; *see also id.* § 3474 ("The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department."). Before proposing regulations to implement Title IV programs, ED must "obtain public involvement in the development" of the regulations, "prepare draft regulations . . . and . . . submit such regulations to a negotiated rulemaking process."  20 U.S.C. § 1098a(a)(1), (b)(1). ED must obtain "the advice of and recommendations from" representatives of "groups involved in student financial assistance programs," including "students, legal assistance organizations that represent students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies."  20 U.S.C. § 1098a(a)(1).  "The hope is that these negotiations will produce a better draft as the basis for the notice and comment proceeding."  *USA Grp. Loan Servs., Inc. v. Riley*, 82 F.3d 708, 714 (7th Cir. 1996).

Plaintiff claims that throughout the 2018 Negotiated Rulemaking sessions, ED's negotiator acted in bad faith by refusing to allow discussion of (1) ED's position on provisions in the 2016 Rule prohibiting schools from imposing mandatory arbitration and class action waivers on students and (2) whether to repeal the 2016 Rule.  In support of these claims, Plaintiff cites only two specific portions of the record.  In the first, in response to a request for ED's position

on two 2016 Rule provisions prohibiting schools from requiring student borrowers to accept pre-dispute arbitration provisions or class action waivers, ED's negotiator stated that "because the prior regulations are under litigation on this specific topic, we're not really able to comment on extensive information regarding where we are with arbitration right now" and that ED was "looking to hear . . . other ideas that [negotiated rulemaking participants] might have as alternatives."  In the second part of the record Plaintiff cites, ED's negotiator stated that certain items forwarded for consideration "were in the 2016 reg.  And so we have already considered those items at the department, and for various reasons we have ruled them out."  Plaintiff also cites a transcript of an audio file purportedly constituting part of a negotiated rulemaking session held on November 13, 2017.  In that transcript, ED's negotiator stated, "we are considering our starting point to be the 1994 regulations."[2]

Recognizing the scant authority addressing challenges to ED conduct during the negotiated rulemaking process, the parties rely on *USA Group Loan Service, Inc. v. Riley*, 82 F.3d at 714.  There, the Seventh Circuit addressed the plaintiffs' claim that ED had negotiated in bad faith during negotiated rulemaking by promising to abide by the consensus reached during that process and then failing to do so.  *Riley*, 82 F.3d at 714.  Noting that the negotiated rulemaking process "simply creates a consultative process in advance of the more formal arms' length procedure of notice and comment rulemaking," *Riley* expressed doubt that the statute contained a remedy for bad faith in negotiated rulemaking.  *Id.*; *see also Career Coll. Ass'n v. Duncan,* 796 F. Supp. 2d 108, 114 n.1 (D.D.C. 2011), *aff'd in part, rev'd in part on other*

---

[2] The parties dispute whether this transcript, which Plaintiff had made and does not appear in the official administrative record, may be considered on summary judgment.  The Court need not resolve this issue because (1) the parties agree that the 1994 Regulations formed the basis for the 2018 Rulemaking and (2) even if the transcript is considered with the other record evidence, there is no evidence of bad faith on ED's part, as described *infra*.

*grounds sub nom. Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427 (D.C. Cir.

2012) (citing *Riley* for the proposition that the HEA does not provide an explicit remedy for bad

faith in the negotiated rulemaking process); *Ctr. for Law & Educ. v. U.S. Dep't of Educ.*, 315 F.

Supp. 2d 15, 30 n.14 (D.D.C. 2004) (noting *Riley*'s statement regarding bad faith in the context

of challenge to negotiated rulemaking process) *aff'd on other grounds*, 396 F.3d 1152 (D.C.

2005).  The Seventh Circuit then persuasively stated in dicta that "a refusal to negotiate that

*really* was in bad faith, because the agency was determined to stonewall, might invalidate the

rule eventually adopted by the agency," but, mindful of the fact that "[n]egotiated rulemaking

does not usually produce a comprehensive administrative record," "[i]f . . . the public record

discloses no evidence of bad faith on the part of the agency, that should be the end of the

inquiry."  *Id.* at 715.

 The record does not show that ED engaged in the 2018 Rulemaking in bad faith or treated

the process "as an empty formality," as Plaintiff claims.  The record shows that ED held

negotiated rulemaking sessions with industry and student representatives across multiple days to

discuss myriad substantive concerns with the proposed rulemaking and that it did not shut down

discussion of the points Plaintiff identifies.

 First, as to arbitration and class actions, the negotiated rulemaking sessions included

substantive discussion of the merits of regulating arbitration agreements and class action waivers

as a top-level agenda item, and ED solicited comments from participants regarding those issues

at the outset of the process.  The bulk of the discussion of those issues occurred after ED's

isolated statement that it was unable to provide "extensive information" due to ongoing litigation

and that it was open to alternatives.  ED cannot be said to have "stonewalled" discussion on the

issues of arbitration and class waivers and its statement regarding litigation around these points

does not rise to the level of bad faith. *Riley*, 82 F.3d at 715.

Second, as to ED's statement that items already considered in the rulemaking process for the 2016 Rule had been considered, debated and ruled out for the 2018 Rulemaking, Plaintiff does not identify what substantive points of discussion were foreclosed but instead states that ED refused to allow discussion "of whether or not to repeal the 2016 Rule at all." That ED took the position that the 2016 Rule was not in effect, or that the 1994 Regulations were the operative ruleset for the negotiations, does not establish that ED was "stonewalling" the negotiation process or acting in bad faith. The record shows that ED held a fulsome negotiated rulemaking process, permitting lengthy discussion of the issues raised by the participants and by Plaintiff, and did not "fail[] to provide a meaningful opportunity to discuss the need for, and content of, a new rule during the negotiated rulemaking proceedings" as Plaintiff claims. To the extent Plaintiff claims ED refused to discuss repeal of the 2016 Rule to foreclose discussion of arbitration provisions and class action waivers, this argument is unsupported for the reasons set forth *supra*. Summary judgment is granted to ED on Plaintiff's claim that the 2019 Rule should be invalidated because ED was determined to foreclose meaningful discussion in the negotiated rulemaking process.

In response, Plaintiff cites cases in which district courts invalidated rules after ED failed to engage in any negotiated rulemaking in the first instance, but those cases do not address allegations of bad faith like Plaintiff's. Plaintiff also notes caselaw stating that notice and comment rulemaking under the APA requires meaningful opportunities for public participation, but the cited cases do not discuss negotiated rulemaking. The record shows a thorough discussion of relevant issues and does not support that ED acted in bad faith by withholding of information or refusing to discuss relevant topics.

## 2.  Notice and Comment Rulemaking Under the APA

Plaintiff claims that ED was required to reinitiate or reopen the notice and comment
rulemaking process of the 2018 NPRM after the 2016 Rule went into effect.  The parties do not
dispute that the 2018 Rulemaking was predicated on the then-effective 1994 regulations.
Plaintiff generally claims that the 2018 NPRM was based on the presumption that the 2016 Rule
would not go into effect and that implementation of the 2016 Rule constituted a changed
circumstance significant enough to reopen the administrative record.

While agencies are obligated to "reexamine their approaches if a significant factual
predicate [in the rulemaking process] changes," *Portland Cement Ass'n v. E.P.A.*, 665 F.3d 177,
187 (D.C. Cir. 2011) (internal quotation marks omitted), "[an] agency [is] not obliged to stop the
entire process because a new piece of evidence emerge[s].  If this were true then the
administrative process could never be completed.  An agency does, however, have an obligation
to deal with newly acquired evidence in some reasonable fashion."  *Catawba Cty., N.C. v.
E.P.A.*, 571 F.3d 20, 45 (D.C. Cir. 2009) (citation omitted).

The party challenging an agency's alleged failure to consider relevant evidence has the
burden to show prejudice.  *See Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 896
F.3d 520, 535 (D.C. Cir. 2018).  That burden is not onerous -- prejudice is absent only where an
agency's mistake "clearly had no bearing on the procedure used or the substance of [the]
decision reached."  *New York Pub. Interest Research Grp. v. Whitman*, 321 F.3d 316, 334 n.13
(2d Cir. 2003) (citation omitted).

Plaintiff does not identify any "newly acquired evidence" other than the implementation
of the 2016 Rule.  From that point, Plaintiff claims that ED relied on its experience implementing
the 2016 Rule in the 2018 NPRM but kept members of the public from commenting on ED's

implementation of the 2016 Rule, thus prejudicing Plaintiff and members of the public by preventing them from sharing the experience of student borrowers under the Rule. These arguments are unpersuasive. First, Plaintiff does not identify any evidence showing that ED relied on its experience in implementing the 2016 Rule in the 2018 NPRM, but instead cites the Federal Register entry for the *2016* rulemaking process. Second, Plaintiff does not identify, nor does the record show, any specific piece of information that came to light after implementation of the 2016 Rule that would justify reopening the administrative record. Plaintiff's vague references to the potential experiences of student borrowers do not meet its low burden to show prejudice. Plaintiff identifies no potential differences in substantive outcome arising from ED's decision not to reopen the negotiated rulemaking or notice and comment process after the 2016 Rule became effective. *See Whitman*, 321 F.3d at 334 n.13. The record shows that the 2018 Rulemaking involved extensive discussion of revisions to the same substantive topics as were addressed in the 2016 Rule. Mindful that not every change in circumstances merits reopening the administrative record, particularly where, as here, the party challenging the agency determination does not identify how those changed circumstances were prejudicial, summary judgment is granted to ED on Plaintiff's claim that ED's failure to reopen the administrative record violated the APA.

### 3. The 2019 Rule's Borrower Defense Statute of Limitations as a Logical Outgrowth of the 2018 NPRM

Plaintiff claims that the addition of a three-year statute of limitations on the assertion of borrower defenses in the 2019 Rule is not a "logical outgrowth" of the 2018 NPRM. The APA requires a federal agency conducting notice and comment rulemaking to include in its NPRM "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). A final rule "need not be an exact replica of the rule proposed

in the notice, only a logical outgrowth" of the proposed rule. *Cooling Water Intake Structure Coal. v. U.S. Envtl. Prot. Agency*, 905 F.3d 49, 61 (2d Cir. 2018) (internal quotation marks and alterations omitted). "Although there is no precise definition of what counts as a logical outgrowth, it is clear that if the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal." *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 558 (S.D.N.Y. 2019) (citing *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 531 (D.C. Cir. 1997) and *Nat'l Black Media Coal. v. Fed. Commc'ns Comm'n*, 791 F.2d 1016, 1022 (2d Cir. 1986)) (internal quotation marks omitted). The relevant test is "whether the agency's notice would fairly apprise interested persons of the subjects and issues of the rulemaking." *Cooling Water*, 905 F.3d at 61.

The 2016 Rule provided a six-year limitations period for borrowers to file affirmative claims, in which a borrower asserts that payment is not owed, and their loan is not yet in collection proceedings. 34 C.F.R. § 685.222(c), (d) (2016). By contrast to affirmative claims, defensive claims are those raised as part of a collection proceeding. The 2016 Rule contains no statute of limitations on defensive claims. In its 2016 rulemaking, ED noted that borrowers could "assert a defense to repayment at any time" during collection.

The 2019 Rule added a three-year statute of limitations for defensive claims. § 685.206(e)(6). The parties dispute whether this addition was a logical outgrowth of the 2018 NPRM. It was not, because during the rulemaking process, ED explicitly disclaimed any intent to impose that limitation and instead confined its limitation discussion to affirmative claims. Accordingly, interested persons and the public were not "fairly apprised" of the proposed rule and were deprived of the opportunity to comment upon it. *Cooling Water*, 905 F.3d at 61.

Specifically, the 2018 NPRM proposed eliminating borrowers' ability to bring

affirmative claims or limiting such claims "to the three-year period following the borrower's departure from the institution to ensure that the institution would have access to records that could be relevant to their defense." This proposal was motivated by a "need to develop appropriate deterrents to frivolous claims." But with respect to defensive claims, the 2018 NPRM stated that (1) "a borrower may be able to assert a defense to repayment at any time during the repayment period, once the loan is in collections," (2) "the current proposal . . . provides borrowers with the opportunity to assert a defense to repayment during a collection proceeding, regardless of how many years after enrollment that proceeding is commenced" and (3) "[t]he proposed regulations do not impose a statute of limitations on the filing of a borrower defense to repayment claim." The 2018 NPRM also stated that ED "considered an alternative approach in which the borrower would have only three years following the end of enrollment at the institution to assert a defense to repayment claim" but did not pursue it because the aforementioned proposal for defensive claims would "provide[] borrowers with the opportunity to assert a defense to repayment during a collection proceeding regardless of [the timing]" since such "proceedings can be initiated at any time during the [loan] repayment period." The 2018 NPRM thus explicitly stated that a three-year statute of limitations on defensive claims was not under consideration and implied that such a rule would be unfair. The addition of that same limitations period to the 2019 Rule thus "deviates too sharply" from the proposed rule, depriving the public of the opportunity to participate meaningfully in the APA-required notice and comment rulemaking process. *New York v. Dep't of Health & Human Servs.*, 414 F. Supp. 3d at 558 (citation omitted). Summary judgment is granted to Plaintiff on its claim that the addition of the three-year statute of limitations on defensive claims was not a logical outgrowth of the 2018 NPRM.

In response, ED acknowledges that "the [2018] NPRM did not specifically contemplate a three-year statute of limitations for defensive claims," but argues that ED's express proposal of a three-year statute of limitations for affirmative claims, and the resulting comments and agency reasoning, apply with equal force to defensive claims, thus obviating any argument that interested parties were unable to effectively comment on the proposed rule. The 2018 NPRM's discussion of affirmative and defensive claims contradicts this argument because ED stated that (1) defensive claims were not subject to a limitations period and (2) it had considered and rejected proposing such an approach.

ED also notes that the 2018 NPRM solicited comments on other time limits related to defensive claims. ED identifies a discussion of filing deadlines for asserting borrower defense claims following ED notice to a borrower of certain administrative actions: wage garnishment, salary offset, tax refund offset or consumer reporting proceedings. This argument is unpersuasive. First, that filing deadlines exist for borrower defenses in response to certain specific ED actions says nothing about whether a statute of limitations applies for borrower defenses generally, whether in response to one of ED's enumerated actions with filing deadlines or otherwise. Second, ED's discussion of these filing deadlines explicitly stated that "[t]his NPRM . . . enables borrowers to assert claims during collection proceedings, which can occur at any time during the repayment period. Borrowers can accordingly raise their defenses whenever such proceedings are instituted, but must comply with the existing filing deadlines for raising defenses in those collections proceedings." Given this explicit disclaimer, made in conjunction with a discussion of filing deadlines in a specific set of ED actions, this portion of the 2018 NPRM does not "fairly apprise[]" interested parties and the public of the statute of limitations on defensive claims in the 2019 Rule. *Cooling Water*, 905 F.3d at 61.

13

## B. Arbitrary and Capricious

Under the APA, courts may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Alzokari v. Pompeo*, 973 F.3d 65, 70 (2d Cir. 2020) (internal quotation marks omitted). "Under this deferential standard of review," a court "may not substitute [its] judgment for that of the agency." *XY Planning Network, LLC v. U.S. Secs. & Exch. Comm'n*, 963 F.3d 244, 255 (2d Cir. 2020) (internal quotation marks omitted). Instead, a reviewing court must "defer to an agency's determinations so long as the agency gives adequate reasons for its decisions, in the form of a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 961 F.3d 160, 170 (2d Cir. 2020) (internal quotation marks and alterations omitted).

Where an agency reverses a prior policy, it must explain its reasons for the change, but need not demonstrate "that the reasons for the new policy are *better* than the reasons for the old one." *See New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 82 (2d Cir. 2020), *cert. granted on separate grounds sub nom., U.S. Dep't of Homeland Sec. v. New York*, No. 20-449, 2021 WL 666376 (U.S. Feb. 22, 2021) (citation omitted). A disagreement over policy is not grounds for finding a rulemaking arbitrary and capricious. *See New York v. Fed. Energy Regulatory Comm'n*, 783 F.3d 946, 959 (2d Cir. 2015) ("[W]e may not displace an agency's choice between two fairly conflicting views, even though we would justifiably have made a

14

different choice had the matter been before us *de novo*.") (internal quotation marks omitted).

Plaintiff challenges various provisions in the 2019 Rule as arbitrary and capricious. Much of Plaintiff's argument, supported by *amici*, simply reflects a competing view of the appropriate policies for student loan defenses. Plaintiff generally contends that ED's changes in the 2019 Rule are based on misjudgments of (1) the extent to which the availability of borrower defenses affects borrower behavior and (2) the extent to which borrowers may bring claims in bad faith. These arguments largely represent Plaintiff's interpretation of the record evidence and the appropriate responsive rulemaking and are not appropriate grounds for finding ED's rulemaking arbitrary and capricious. The specific deficiencies Plaintiff alleges in the record and ED's reasoning are addressed below.[3]

### 1. Standard for Relief

The 2016 Rule permitted a borrower to obtain debt relief if her school made a "substantial misrepresentation," defined as (1) intentional falsehoods and (2) statements that have "the likelihood or tendency to mislead under the circumstances," including statements that omit information in a "false, erroneous, or misleading" way. 34 C.F.R. §§ 668.71(c), 668.222(d) (2016). The 2019 Rule (1) narrowed the definition of misrepresentation to require evidence of an institution's intent to mislead or its reckless regard of the truth; (2) imposed a documentation requirement that required any misrepresentations to be in writing and (3) imposed a financial harm requirement -- borrowers alleging misrepresentation may obtain relief only if they prove financial harm other than their student loan debt. § 685.206(e)(3), (e)(4) (2019). These changes were not arbitrary and capricious. First, ED provided reasoned justifications for these changes:

---

[3] Plaintiff's challenge to the three-year statute of limitations on defensive claims as arbitrary and capricious is not addressed because the issue is remanded to ED, *infra*, for the reasons discussed in the text *supra*.

to (1) prevent inadvertent mistakes from giving rise to misrepresentation liability; (2) strike a balance between protecting borrowers and taxpayers by requiring a quantum of proof that misrepresentation had occurred; (3) better guard the interests of students, institutions acting in good faith and taxpayers who ultimately bear the costs of mistaken misrepresentations; (4) prevent frivolous claims by students who take issue with the substance or conduct of their education and wish to avoid repaying debts and (5) take into account the fact that schools regularly document their financial representations to students so as not to inadvertently chill productive communications between institutions and students. Second, ED supported these justifications with citations to the administrative record including: (1) discussions and rejections of the arguments Plaintiff now raises; (2) underlying empirical evidence and (3) reasoned discussion of deviations from the 2016 Rule. Because ED's additions to the 2019 Rule resulted from a rational evaluation of the evidence, explained on the record and coupled with a thorough notice and comment process, they are not arbitrary and capricious. Summary judgment is granted to ED on this issue.

### 2. Elimination of Group Claims Process

The 2019 Rule repealed a provision in the 2016 Rule that permitted ED to decide on a groupwide basis borrower defense claims raising common issues. § 685.222(f)-(h) (2016). This change was not arbitrary and capricious. First, ED justified it based on the revised definition of misrepresentation, which omitted claims for inadvertent errors by institutions and required fact-specific, individualized showings of harm. Second, ED highlighted the potential burden on it and taxpayers if group claims discharged debts of borrowers that were not subjected to or otherwise harmed by the misrepresentation. Third, ED expressed concern for the professional prospects of students whose loans were forgiven on a groupwide basis, as schools could decline

to issue transcripts to such students, thus hindering their employment opportunities. Plaintiff claims that no evidence supports an additional justification that ED acknowledged for the change -- "outside actors attempting to personally gain from the bad acts of" schools engaged in the group claims process. That allegation does not alter ED's other expressed justifications, supported by the record and discussed during the rulemaking, for the change. *See Nat. Res. Def. Council*, 961 F.3d at 170 (as "long as the agency gives adequate reasons for its decisions, in the form of a satisfactory explanation for its action including a rational connection between the facts found and the choice made," courts must defer to those decisions) (internal quotation marks omitted). Summary judgment is granted to ED on this issue.

### 3. Amount of Relief Afforded to Borrowers

ED replaced a provision in the 2016 Rule used to calculate the amount of relief due to borrowers who raised successful defenses, § 685.222(i)(2)(i) (2016), with a provision in the 2019 Rule that does "not include a specific methodology . . . for determining the amount of financial harm," but instead states that "[f]inancial harm is the amount of monetary loss that a borrower incurs as a consequence of a misrepresentation" and provides a non-exhaustive list of types of evidence of financial harm, §§ 685.206(e)(4), (12) (2019). This change was not arbitrary and capricious. ED thoroughly explained its reasoning: that (1) it wished to provide varying levels of relief to borrowers based on harm each one suffered rather than provide a one-size-fits-all calculation and (2) it was pursuing a flexible approach permitting individualized harm determinations based on whatever evidence students could provide. Plaintiff claims that ED has provided inadequate explanation of how any harm would be calculated, and thus that the change is arbitrary and capricious. The absence of a fixed formula for calculating harm follows from ED's stated policy goal of permitting a flexible approach to determining student harm, based on

evidence of "the amount of monetary loss" incurred by a borrower "as a consequence of a misrepresentation." § 685.206(e)(4) (2019). Summary judgment is granted to ED on this issue.

### 4. Pre-Dispute Arbitration Agreements and Class Action Waivers

Under the 2016 Rule, schools could not participate in the Direct Loan Program unless they agreed not to impose mandatory pre-dispute arbitration agreements or class action waivers on students. § 685.300(e)-(f) (2016). The 2019 Rule permitted schools to impose mandatory arbitration provisions and class action waivers provided they were disclosed to prospective borrowers. §§ 668.41(h), 304 (2019). This change was not arbitrary and capricious because ED adequately explained its rationale: (1) arbitration is often more efficient and class actions often benefit attorneys more than plaintiffs; (2) the reduced costs of arbitration could result in passed-on savings to students in the form of reduced tuition and fees and (3) the change supported ED's policy objective of permitting students individualized choices as to how to approach borrower defenses. The record contains a thorough discussion of these justifications and consideration of alternative proposals.

Plaintiff claims that ED unduly relied on certain reports discussing the benefits of arbitration and detriments of class litigation. Plaintiff argues that evidence was presented in a separate context from student borrower defenses and that, properly considered, the evidence discourages arbitration and promotes class actions. First, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Fund for Animals v. Kempthorne*, 538 F.3d 124, 132 (2d Cir. 2008) (citation omitted). Second, Plaintiff does not explain why ED could not reasonably extrapolate from the challenged sources, which discuss general principles applicable to arbitration and class actions, to the context of student borrower defenses.

Plaintiff also claims that ED failed to explain adequately why it departed from its comments in the rulemaking process for the 2016 Rule. There, ED noted the beneficial deterrent effects of class actions and that students could not make informed choices as to pre-dispute arbitration and class action agreements, given their lack of familiarity with either. The 2018 Rulemaking record shows that, as compared with the 2016 NPRM, ED was drawing a different conclusion from the evidence and adopting a different policy with respect to pre-dispute agreements of ensuring student choice and rapid access to relief. Plaintiff's argument on this point fails.

With respect to class actions, ED acknowledged that it was departing from the approach taken in the 2016 NPRM, stating that it "rejects the suggestion in the 2016 NPRM that class actions against certain institutions would have motivated other institutions to change their practices. In fact, it is possible that many institutions changed their approach in light of allegations made against those certain institutions, including those made by attorneys general, regardless of whether students had been able to bring class actions." Plaintiff contends that, without evidence, this speculation renders ED's change from the 2016 NPRM arbitrary and capricious. This argument is unpersuasive. ED has "explained its reasons for the change," *Dep't of Homeland Sec.*, 969 F.3d at 82 (2d Cir. 2020), and articulated a rational connection between the facts found and the change, *Nat. Res. Def. Council*, 961 F.3d at 170. Ultimately, ED's decision to permit class action waivers is based on ED's rational interpretation of, and reliance on, evidence showing shortcomings with class litigation in the borrower defense context. Because ED has explained why those shortcomings justify a change in the rule, Plaintiff's argument that ED has failed to address differences in class action waivers between the 2019 Rule and 2016 Rule fails.

19

**5. Elimination of Disclosure Requirements**

Under the 2016 Rule, for-profit institutions were required disclose to students and potential students: (1) whether median borrowers at the institution had failed to reduce their loan balance by at least one dollar and (2) if the institution had experienced indications of financial problems that required it to provide financial protection to ED. §§ 668.41(h), (i) (2016). The 2019 Rule eliminated these requirements. ED justified the first change on the basis that any benefit from knowing the loan repayment rate for a for-profit school was negated by lack of knowledge of loan repayment rates at non-profit or public schools, creating the potential for student borrowers to enroll at non-profit or public schools with a worse loan repayment rate than the for-profit school. ED justified the second change on the basis that such disclosures are potentially misleading and could harm the reputations of such institutions and diminish the employment opportunities available for students and graduates. ED acknowledged that such disclosures could be helpful to students, as evidenced by the 2016 Rule's disclosure requirements, but balanced that benefit against the adverse effects on for-profit institutions and students to conclude that they should be removed. Summary judgment is granted to ED on this issue.

Plaintiff argues that ED's only stated rationale for rescission of these disclosure requirements was that (1) pursuant to a different ED rule, known as the Gainful Employment Rule, institutions had been required to make loan repayment disclosures and (2) because ED had rescinded the Gainful Employment Rule, it would also rescind the disclosure requirements in the 2016 Rule. Plaintiff's argument is unpersuasive because ED's discussion of the Gainful Employment rule was followed by the above-described justifications for removing the disclosure requirements.

20

### 6.  Elimination of Automatic Closed School Discharges

Under the 2016 Rule, ED was required to discharge automatically the loans of students who did not re-enroll in any Title IV-eligible institution within three years of the closure of the school they had previously attended, 34 C.F.R. § 685.214(c)(2)(ii) (2016).  In a related requirement, closing schools were also required to notify students of the availability of a non-automatic loan discharge process.  § 668.14(b)(32) (2016).  The 2019 Rule eliminated these requirements.  This change was not arbitrary and capricious.  One of ED's stated objectives for the 2019 Rule was to encourage students at closing schools to complete their education, either by transferring to another institution or by accepting a teach-out plan offered by the closing institution, rather than simply obtaining a loan discharge without earning useful skills or credentials.  ED concluded that automatic loan discharges could hinder that goal and that eliminating such discharges and moving to an application-only process would "create a path for students to finish their degree, certificate, or program, rather than create perverse incentives to stop their schooling, with only a plan for an indeterminate, future starting date."  Although Plaintiff disputes the accuracy of this finding with various items of evidence, its argument is unpersuasive because ED explained its rationale and based its decision in part on historical re-enrollment data for borrowers from schools that closed.  *Nat. Res. Def. Council*, 961 F.3d at 170 (agency action is not arbitrary and capricious when agency demonstrates a "rational connection between the facts found and the choice made").

## IV.  REMEDY

"In the usual case, when an agency violates its obligations under the APA," courts "vacate a judgment and remand to the agency to conduct further proceedings."  *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014) (citation omitted).  An agency action found to be

arbitrary and capricious may remain in place pending remand to the agency for correction of its defects. *Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 808 F.3d 556, 584 (2d Cir. 2015). That decision is within the court's equitable discretion, *id.*, and courts consider the "[1] seriousness of the [action's] deficiencies and [2] the likely disruptive consequences of vacatur." *Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, No. Civ. 5174, 2020 WL 2769491, at *1 (S.D.N.Y. Apr. 15, 2020) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)). The first factor weighs in favor of remand rather than vacatur. Although Plaintiff alleges numerous deficiencies in the 2019 Rule, summary judgment is granted only as to the three-year statute of limitations on defensive claims, while the vast majority of the 2019 Rule remains untouched. As to the second factor, although vacatur of the 2019 Rule would simply mark a return to the 2016 Rule, there would be some degree of disruption to students asserting borrower defenses under the rule currently in place. Remand, rather than vacatur, is the appropriate remedy.

## V.    CONCLUSION

For the reasons stated, Plaintiff's motion for summary judgment on its claim that the 2019 Rule's statute of limitations on defensive claims is not a logical outgrowth of the rulemaking process is GRANTED. ED's motion for summary judgment on the remaining claims is GRANTED. This matter is remanded to ED for further proceedings consistent with this Opinion and Order. The Clerk of Court is respectfully directed to close the motion at Docket No. 66 and to close this case.

Dated:  March 17, 2021
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE