# 21-888

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

NEW YORK LEGAL ASSISTANCE GROUP,
Plaintiff-Appellant,

v.

MIGUEL A. CARDONA, in his official capacity as Secretary of
Education, and UNITED STATES DEPARTMENT OF EDUCATION,
Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF OF APPELLANT
## NEW YORK LEGAL ASSISTANCE GROUP

Eileen M. Connor
PROJECT ON PREDATORY STUDENT
LENDING, LEGAL SERVICES CENTER
OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003

Adam R. Pulver
Adina H. Rosenbaum
PUBLIC CITIZEN
LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

July 21, 2021

*Counsel for Appellant*

## CORPORATE DISCLOSURE STATEMENT

New York Legal Assistance Group is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

/s/ Adam R. Pulver
Adam R. Pulver

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..............................................i

TABLE OF CONTENTS ................................................................ii

TABLE OF AUTHORITIES ..........................................................iv

INTRODUCTION .........................................................................1

STATEMENT OF JURISDICTION ...............................................4

STATEMENT OF THE ISSUES ......................................................7

STATEMENT OF THE CASE ..........................................................8

I.     Nature of the Case .............................................................8

II.    Statutory and Regulatory Background..............................9

       A.     Title IV of the Higher Education Act.....................9

       B.     The 1994 Rule and the For-Profit Crisis ..............10

       C.     The 2016 Rule ........................................................12

III.   The 2019 Rule....................................................................15

IV.    This Litigation....................................................................17

ARGUMENT ...............................................................................25

I.     The 2019 Rule is arbitrary and capricious. ...................25

       A.     Changes to the claims process and standard for relief were
              arbitrary and capricious.......................................27

              1.     ED's explanation of why changes were necessary was
                     irrational and unsupported by the record. .................28

2.    The 2019 evidentiary and substantive standard reflects arbitrary and capricious decisionmaking. ................... 32

3.    The 2019 Rule's financial harm requirement is arbitrary and capricious. ............................................. 36

4.    ED's elimination of the group claims process was arbitrary and capricious. ............................................. 40

B.    ED's elimination of automatic closed school discharges and related disclosures was arbitrary and capricious. ................ 46

C.    The rescission of conditions on the use of pre-dispute arbitration agreements and class action waivers was arbitrary and capricious. ..................................................... 52

II.    The district court abused its discretion in declining to vacate the defensive statute of limitations provision. ............................ 62

CONCLUSION .................................................................... 67

CERTIFICATE OF COMPLIANCE ...................................... 68

# TABLE OF AUTHORITIES

**Cases**                                         **Page(s)**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ....................................................... 64

*Allina Health Services v. Sebelius,*
    746 F.3d 1102 (D.C. Cir. 2014) ..................................................... 65

*Alzokari v. Pompeo,*
    973 F.3d 65 (2d Cir. 2020) ............................................................ 59

*American Great Lakes Ports Ass'n v. Schultz,*
    962 F.3d 510 (D.C. Cir. 2020) .................................................. 5, 6

*Ayotte v. Planned Parenthood of Northern New England,*
    546 U.S. 320 (2006) ....................................................................... 63

*Bauer v. DeVos,*
    No. 17 Civ. 1330, Minute Order (D.D.C. Oct. 12, 2018) ............... 14

*Bauer v. DeVos,*
    332 F. Supp. 3d 181 (D.D.C. 2018) ............................................... 14

*Bauer v. DeVos,*
    325 F. Supp. 3d 74 (D.D.C. 2018) ................................................. 14

*Bey v. City of New York,*
    999 F.3d 157 (2d Cir. 2021) ............................................................ 5

*Carlson v. Postal Regulatory Commission,*
    938 F.3d 337 (D.C. Cir. 2019) ................................................ 62, 63

*Catholic Social Services v. Shalala,*
    12 F.3d 1123 (D.C. Cir. 1994) ....................................................... 63

*Chamber of Commerce of the United States v. SEC,*
    443 F.3d 890 (D.C. Cir. 2006)...........................................................65

*Council Tree Communications v. FCC,*
    619 F.3d 235 (3d Cir. 2010)...........................................................65

*CSX Transportation, Inc. v. Surface Transportation Board,*
    584 F.3d 1076 (D.C. Cir. 2009)...........................................................65

*Daimler Trucks North America LLC v. EPA,*
    737 F.3d 95 (D.C. Cir. 2013) ...........................................................65

*Davies v. Johanns,*
    477 F.3d 968 (8th Cir. 2007) ...........................................................7

*Detsel v. Sullivan,*
    895 F.2d 58 (2d Cir. 1990)...........................................................45

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ...........................................................34, 39

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2008) ...........................................................1, 26, 31, 34, 62

*Fogo De Chao (Holdings) Inc. v. U.S. Department of Homeland
    Security,*
    769 F.3d 1127 (D.C. Cir. 2014)...........................................................45–46

*Graphic Communications International Union, Local 554 v.
    Salem-Gravure Division of World Color Press, Inc.,*
    843 F.2d 1490 (D.C. Cir. 1988)...........................................................36

*Guertin v. United States,*
    743 F.3d 382 (2d Cir. 2014)...........................................................20

*Heartland Regional Medical Center v. Sebelius,*
    566 F.3d 193 (D.C. Cir. 2009)...........................................................65

*Highmark Inc. v. Allcare Health Management System, Inc.*,
    572 U.S. 559 (2014) .................................................................. 25

*International Union, United Mine Workers of America v. U.S.*
    *Department of Labor*,
    358 F.3d 40 (D.C. Cir. 2004) ......................................... 46

*Islander East Pipeline Co. v. McCarthy*,
    525 F.3d 141 (2d Cir. 2008)................................... 4, 26–27

*Karpova v. Snow*,
    497 F.3d 262 (2d Cir. 2007).......................................... 25

*Limnia, Inc. v. Department of Energy*,
    857 F.3d 379 (D.C. Cir. 2017).......................................... 6

*Littlefield v. Mashpee Wampanoag Indian Tribe*,
    951 F.3d 30 (1st Cir. 2020) ............................................. 6

*In re Long-Distance Telephone Service Federal Excise Tax Refund*
    *Litigation*,
    751 F.3d 629 (D.C. Cir. 2014)......................................... 6

*Long Island Head Start Child Development Services v. NLRB*,
    460 F.3d 254 (2d Cir. 2006).......................................... 40

*Mashpee Wampanoag Tribe v. Bernhardt*,
    466 F. Supp. 3d 199 (D.D.C. 2020)................................. 58

*Missouri Public Service Commission v. FERC*,
    337 F.3d 1066 (D.C. Cir. 2003)...................................... 54

*Motor Vehicle Manufacturers Ass'n of the U.S. v. State Farm*
    *Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983) ........................................ 1, 26, 30, 41

*NRDC v. EPA*,
    961 F.3d 160 (2d Cir. 2020) ................................... 34, 45

*NRDC v. EPA*,
    808 F.3d 556 (2d Cir. 2015) ..................................................... 20, 25

*NRDC v. EPA*,
    658 F.3d 200 (2d Cir. 2011) .......................................................... 26

*NRDC v. EPA*,
    No. 19 Civ. 5174, 2020 WL 2769491 (S.D.N.Y. Apr. 15, 2020) ..... 64

*NRDC v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) .......................................................... 63

*New York v. U.S. Department of Health & Human Services*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ............................................ 28

*New York v. U.S. Department of Homeland Security*,
    969 F.3d 42 (2d Cir. 2020)........................................................ 26–27

*New York v. U.S. Department of Labor*,
    477 F. Supp. 3d 1 (S.D.N.Y. 2020) ................................................ 63

*Safe Extensions, Inc. v. FAA*,
    509 F.3d 593 (D.C. Cir. 2007)........................................................ 49

*Sierra Forest Legacy v. Sherman*,
    646 F.3d 1161 (9th Cir. 2011) ..................................................... 6–7

*Somoza v. New York City Department of Education*,
    538 F.3d 106 (2d Cir. 2008)............................................................. 5

*Stand Up for California! v. U.S. Department of Interior*,
    879 F.3d 1177 (D.C. Cir. 2018)...................................................... 25

*Sweet v. DeVos*,
    495 F. Supp. 3d 835 (N.D. Cal. 2020) ........................................... 29

*Tripoli Rocketry Ass'n v. Bureau of Alcohol,*
  *Tobacco, Firearms & Explosives,*
  437 F.3d 75 (D.C. Cir. 2006) .................................................. 54–55

*United States v. Smith,*
  945 F.3d 729 (2d Cir. 2019) .......................................................... 64

*United Steel v. Mine Safety & Health Administration,*
  925 F.3d 1279 (D.C. Cir. 2019) .................................................... 26

*Williams Gas Processing-Gulf Coast Co. v. FERC,*
  475 F.3d 319 (D.C. Cir. 2006) ...................................................... 45

**Statutes**

Administrative Procedure Act:

  5 U.S.C. § 551(13) ........................................................................ 62

  5 U.S.C. § 706(2)(C) ..................................................................... 62

Higher Education Act:

  20 U.S.C. §§ 1070–1099d ............................................................... 9

  20 U.S.C. § 1087(c)(1) ................................................................. 10

  20 U.S.C. § 1087b(a) ...................................................................... 9

  20 U.S.C. § 1087d ........................................................................ 10

  20 U.S.C. § 1087e(h) .................................................................... 10

  20 U.S.C. § 1094 ...................................................................... 9, 10

  20 U.S.C. § 1098a ........................................................................ 10

28 U.S.C. § 1291 ............................................................................ 5

28 U.S.C. § 1331 ............................................................... 4

**Regulations**

Current Regulations:

34 C.F.R. § 99.7(a)(1) .................................................. 50

34 C.F.R. § 600.2 ........................................................ 48

34 C.F.R. § 602.24(c) .................................................. 50

34 C.F.R. § 668.14(b)(29) ........................................... 50

34 C.F.R. § 668.41(c)–(g) ........................................... 50

34 C.F.R. § 668.41(h) .................................................. 53

34 C.F.R. § 685.201 ...................................................... 9

34 C.F.R. § 685.206(e) ................................................ 66

34 C.F.R. § 685.206(e)(2) ...................................... 16, 39

34 C.F.R. § 685.206(e)(3) ...................................... 16, 32

34 C.F.R. § 685.206(e)(4) .................................. 16, 36, 37

34 C.F.R. § 685.206(e)(6) .................................. 16, 64, 67

34 C.F.R. § 685.206(e)(8) .............................. 16, 32, 36, 43

34 C.F.R. § 685.222 .................................................... 40

34 C.F.R. § 685.300 ...................................................... 9

34 C.F.R. § 685.303 ...................................................... 9

34 C.F.R. § 685.304 ...............................................................53

Historical Regulations:

34 C.F.R. § 668.14(b)(32) (2016)................................... 14, 47

34 C.F.R. § 668.71(c) (2016) ......................................... 13, 32

34 C.F.R. § 668.171 (2016) ................................................. 12

34 C.F.R. § 685.214(c)(2)(ii) (2016) .............................. 14, 47

34 C.F.R. § 685.222 (2016) ................................................. 13

34 C.F.R. § 685.222(b)–(d) (2016).................................... 13

34 C.F.R. § 685.222(e)(7) (2016)....................................... 13

34 C.F.R. § 685.222(f)–(h) (2016) ..................................... 40

34 C.F.R. § 685.222(f) (2016)............................................ 13

34 C.F.R. § 685.300(e) (2016)...................................... 14, 53

34 C.F.R. § 685.300(f) (2016)....................................... 14, 53

**Rules, Notices, and Other Agency Publications**

U.S. Department of Education, Federal Student Aid, *Annual Report FY 2020* (Nov. 16, 2020) ........................................9

U.S. Department of Education, Final rule, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49788 (Sept. 23, 2019) ..................... *passim*

U.S. Department of Education, Notice of proposed rulemaking, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 83 Fed. Reg. 37242 (July 31, 2018) ............................................................ 15

U.S. Department of Education, Notice, Intent to establish negotiated rulemaking committees, 82 Fed. Reg. 27640 (June 16, 2017) .................................................................. 66

U.S. Department of Education, Final Regulations, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75926 (Nov. 1, 2016).............. *passim*

U.S. Department of Education, Notice of proposed rulemaking, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 39330 (June 16, 2016) .............. 11, 12

U.S. Department of Education, Notice, Intent to establish negotiated rulemaking committee, 80 Fed. Reg. 50588 (Aug. 20, 2015) ......................................................... 66

U.S. Department of Education, Final regulations, William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61664 (Dec. 1, 1994) ............................................................ 10

## Miscellaneous

American Bar Ass'n, Section of Dispute Resolution, "Section Membership" ......................................................... 59

xi

American Bar Ass'n, Section of Dispute Resolution, "Benefits of Arbitration for Commercial Disputes," ............................................... 54

James R. Copland, et al., *Class Actions and Mass Torts*, Trial Lawyers, Inc. 2016, Manhattan Institute (2016) .............................. 60

Jeff Sovern, et al., *"Whimsy Little Contracts" with Unexpected Consequences: An Empirical Analysis of Consumer Understanding of Arbitration Agreements*, 75 Md. L. Rev. 1 (2015) ................................................................................................. 56

Debra Pogrund Stark & Jessica M. Choplin, *A License to Deceive: Enforcing Contractual Myths Despite Consumer Psychological Realities*, 5 N.Y.U. J. L. & Bus. 617 (2009) ........................................ 56

# INTRODUCTION

Administrative agencies are not forever bound by the rules and policies they adopt. But any changes an agency makes cannot be based on caprice; rather, as with any agency action, the agency must provide a reasoned explanation, supported by the record. *See*, *e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983). To start, reasoned decisionmaking requires an agency to acknowledge that it is changing position. And where an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must also acknowledge those underlying contradictions, and provide a "reasoned explanation … for disregarding facts and circumstances that underlay the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In promulgating the 2019 rule at issue in this case, the U.S. Department of Education (ED) failed to meet these requirements. Yet although the record demonstrates that the rule is not the product of reasoned decisionmaking, the district court upheld the bulk of the rule.

The 2019 rule largely rescinded a 2016 rule designed to hold higher education institutions accountable for deceptive conduct and to make it

1

easier for student borrowers to obtain student-loan relief when they were the victims of such conduct. In 2019, adopting nearly insuperable obstacles for borrowers seeking to vindicate their statutory rights and eliminating nearly all accountability measures for schools, ED ignored its own prior factual findings as to the widespread misconduct by for-profit schools that had prompted the 2016 rule—without acknowledging or explaining why it was appropriate to do so, or the detailed evidence submitted by commenters. Instead, ED concocted speculative theories of student borrower conduct and used those theories to justify changes to the processes by which defrauded students could obtain debt relief or otherwise hold schools accountable.

For instance, ED speculated that student borrowers themselves were responsible for being defrauded—a problem that could be solved if they made more "informed consumer decisions." This theory has no support in the record and is contradicted by ED's 2016 findings—from which ED did not explain its departure—and by extensive additional evidence showing that information and bargaining asymmetry prevent meaningful consumer choice. Moreover, by eliminating several disclosure

requirements, the 2019 Rule made it harder for students to be more informed consumers.

In addition, ED relied on unsupported theories relating to student borrowers who seek loan relief—accusing them and others of acting in bad faith in seeking statutory remedies, misrepresenting the burdens and difficulties associated with various processes and compelled individual arbitration requirements, and making unfounded assumptions about how student borrowers would react to changes to the processes for obtaining relief. ED had explicitly rejected these theories in 2016, and it failed to acknowledge or explain its change of heart in 2019.

While ED's unsupported theories permeated the 2019 rule, they particularly infected three aspects of it: (1) changes to the standards and process for obtaining "borrower defense" relief provided for by statute; (2) the elimination of automatic "closed school discharges"; and (3) the rescission of conditions on the use of pre-dispute arbitration agreements and class action waivers. Below, Plaintiff-Appellant New York Legal Assistance Group, a nonprofit organization that provides a variety of free services to student borrowers seeking relief via ED's administrative processes, pointed to detailed record evidence showing that the agency

failed to satisfy the requirements of reasoned decisionmaking as to these provisions. The district court largely deferred to the agency's unsupported conclusions and unexplained reversals, failing to make the required "searching and careful" inquiry of the record and the agency's rationale. *Islander E. Pipeline Co. v. McCarthy*, 525 F.3d 141, 151 (2d Cir. 2008). And although the court correctly held that one aspect of the rule—the statute of limitations for "defensive" borrower defense claims—was unlawful, it erred in failing to vacate that provision, which is plainly severable.

The district court's opinion should be reversed and the case remanded with instructions to vacate the 2019 Rule.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. On March 17, 2021, the court entered a final opinion and order granting in part and denying in part the motion for summary judgment filed by plaintiff-appellant New York Legal Assistance Group (NYLAG), granting in part and denying in part the motion for summary judgment filed by defendants-appellees ED and then-Secretary of Education Elisabeth DeVos, "remand[ing] to ED for further proceedings," and directing the

4

Clerk of Court to close the case. SPA22. On March 19, 2021, the district court entered judgment in favor of NYLAG on its claim that the 2019 Rule's statute of limitations on defensive claims is not a logical outgrowth of the rulemaking process, and entered judgment in favor of ED on all other claims, and closed the case. SPA23. On April 7, 2021, NYLAG timely filed a notice of appeal as to the March 17, 2021 opinion and order and March 19, 2021 judgment. JA1544.

Although the district court stated that it was "remanding" the action to ED for further proceedings, this Court has jurisdiction under 28 U.S.C. § 1291 given the "indications that the District Court's intent was to end the litigation on the merits in the District Court." *Somoza v. N.Y. City Dep't of Ed.*, 538 F.3d 106, 113 n.5 (2d Cir. 2008). As in *Somoza*, the district court directed the clerk of court to close the case, and there is "no evidence of the court's intent to retain jurisdiction or any 'contemplation of further proceedings.'" *Id.* at 112, 113 n.5 (citation omitted).

In determining whether an order is final and appealable, this Court "eschew[s] formalism in favor of a pragmatic approach." *Bey v. City of N.Y.*, 999 F.3d 157, 163 (2d Cir. 2021). Here, "[t]his appeal presents the only opportunity" for NYLAG to challenge the district court's order. *Am.*

5

*Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 515 (D.C. Cir. 2020). The district court did not direct ED to revisit the aspects of the 2019 Rule that NYLAG argued were arbitrary and capricious, and "treating the district court's remand order as unappealable would effectively preclude plaintiffs from ever challenging the district court's decisions." *In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 751 F.3d 629, 633 (D.C. Cir. 2014) (cleaned up).

Although this Court does not appear to have addressed analogous circumstances, the posture of this appeal is indistinguishable from that addressed by the D.C. Circuit in *American Great Lakes*. There, the D.C. Circuit found it had jurisdiction over an appeal of a district court decision that rejected the majority of private plaintiffs' challenges to a Coast Guard rule, while agreeing on one issue and remanding without vacatur as to that issue. 962 F.3d at 514–15. Applying the same pragmatic approach this Court applies, the court found such a remand order final and appealable. *Id.* at 516 (quoting *Limnia, Inc. v. Dep't of Energy*, 857 F.3d 379, 385 (D.C. Cir. 2017)). Other courts of appeals have reached the same conclusion in similar circumstances. *See, e.g.*, *Littlefield v. Mashpee Wampanoag Indian Tribe*, 951 F.3d 30, 35–36 (1st Cir. 2020); *Sierra*

6

*Forest Legacy v. Sherman*, 646 F.3d 1161, 1175–76 (9th Cir. 2011); *Davies v. Johanns,* 477 F.3d 968, 971 (8th Cir. 2007).

## STATEMENT OF THE ISSUES

1.   Whether ED's adoption of changes to the borrower defense claims process that make it nearly impossible for students to vindicate their statutory rights was arbitrary and capricious.

2.   Whether ED's elimination of automatic closed school discharges and disclosure requirements for closing schools without meaningful consideration of the burdens associated with the application process was arbitrary and capricious.

3.   Whether ED's rescission of conditions on the use of pre-dispute arbitration agreements and class action waivers based on an unsupported reversal of its 2016 factual findings was arbitrary and capricious.

4.   Whether the district court erred in failing to vacate the portion of the 2019 Rule that it found unlawful.

## STATEMENT OF THE CASE

### I.     Nature of the Case

ED published the 2019 Rule on September 23, 2019. ED, Final rule, Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49788 (JA1317). On February 19, 2020, NYLAG filed this action in the United States District Court for the Southern District of New York, alleging claims under the Administrative Procedure Act, 5 U.S.C. §§ 702, 706(2). The case was assigned to the Hon. Lorna G. Schofield. The parties cross-moved for summary judgment under Federal Rule of Civil Procedure 56. On March 17, 2021, the district court granted summary judgment to NYLAG as to "its claim that the statute of limitations on defensive borrower claims in the challenged rule is not a logical outgrowth of the proposed rulemaking," and to ED on all other claims. SPA1. As to remedy, the court found "[r]emand, rather than vacatur, is the appropriate remedy," because "summary judgment is granted only as to the three-year statute of limitations on defensive claims, while the vast majority of the 2019 Rule remains untouched." SPA22. The decision

below is not yet reported but is available on Westlaw at 2021 WL 1026234

(S.D.N.Y. Mar. 17, 2021).

## II.    Statutory and Regulatory Background

### A.    Title IV of the Higher Education Act

Title IV of the Higher Education Act (HEA), 20 U.S.C. §§ 1070–

1099d, establishes several programs that provide financial assistance to

students pursuing postsecondary education at certain institutions of

higher education. The largest such program is the Federal Direct Loan

Program, through which ED distributed $86 billion in aid in 2020. *See*

ED, Federal Student Aid, *Annual Report FY 2020*, at 17 (Nov. 16, 2020),

https://www2.ed.gov/about/reports/annual/2020report/fsa-report.pdf. Via

the Direct Loan Program, ED provides loans to students who attend

participating schools (and to the parents of such students). *See* 20 U.S.C.

§ 1087b(a). Participating schools enter into "Program Participation

Agreements" with ED, through which they agree to comply with the

HEA, its implementing regulations, and applicable state laws. *See* 20

U.S.C. § 1094; 34 C.F.R. § 685.300. Eligible students then apply for loans

directly with ED, which disburses funds to participating schools. *See* 34

C.F.R. §§ 685.201, 685.303.

The statute imposes conditions on participating schools and authorizes ED to promulgate additional conditions. *See*, *e.g.*, 20 U.S.C. §§ 1087d, 1094(a), 1098a. Congress also included provisions identifying situations in which borrowers should not be liable for student loan debt, two of which are relevant to this appeal. First, the statute requires ED to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of" Direct Loans (the "borrower defense" provision). 20 U.S.C. § 1087e(h). Second, the statute requires ED to discharge a borrower's liability on loans when a student is "unable to complete the program in which such student is enrolled due to the closure of the institution" ("closed school" discharges). 20 U.S.C. § 1087(c)(1).

## B.  The 1994 Rule and the For-Profit Crisis

In 1994, ED promulgated borrower defense regulations, providing a defense to repayment where borrowers demonstrated that a school's acts or omissions "would give rise to a cause of action under applicable State law." ED, Final Regulations, William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61664, 61696 (Dec. 1, 1994). These rules were silent on the process for borrowers to assert such defenses, however.

10

Although initially intended to serve as a placeholder, the regulations remained in place for two decades. *See* ED, Notice of Proposed Rulemaking, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 39330, 39335 (June 16, 2016).

Few borrowers sought relief under the 1994 regulations until 2015, when Corinthian Colleges, a group of for-profit schools, went into bankruptcy. *Id.* "Corinthian collapsed under deteriorating financial conditions" and after state and federal investigations revealed that Corinthian "had misrepresented its job placement rates" to students, *id.*, and its collapse alone led to thousands of borrower defense claims being filed with ED. *Id.* at 39336. The Corinthian claims, and "the growth of the proprietary higher education sector" more generally, highlighted "difficulties in application and interpretation of the current State law standard, as well as the lack of clarity surrounding the procedures that apply for borrower defense." *Id.* ED thus commenced new rulemaking proceedings in 2016 "to establish a more accessible and consistent

11

borrower defense standard and clarify and streamline the borrower defense process to protect borrowers and improve the Department's ability to hold schools accountable for actions and omissions that result in loan discharges." *Id.* at 39331; *see also* ED, Final Regulations, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75926, 75926 (Nov. 1, 2016) (JA13).

### C.    The 2016 Rule

ED published the resulting rule on November 1, 2016, with most provisions effective July 1, 2017. The 2016 Rule included several provisions designed to increase institutional accountability and protect students and the public fisc, including by directly regulating the relationship between schools and ED. *See*, *e.g.*, *id.* at 75978–76014 (JA65–101). For example, the rule required schools to provide letters of credit upon "triggering" one of specified events that signified financial instability, 34 C.F.R. § 668.171 (2016), and regulated the process by

12

which ED would attempt to recoup funds from schools where it had approved a borrower defense claim, *id*. § 685.222(e)(7) (2016).

The 2016 Rule also included provisions relating to how students could obtain relief from student loan debt. The rule, for the first time, adopted clear and consistent procedures for borrowers to assert a defense to repayment. *See generally* 34 C.F.R. § 685.222 (2016). The rule provided that borrowers had a defense to repayment if they were party to a judgment against a school based on violations of state or federal law, a school had breached its contractual obligations, or a school had "made a substantial misrepresentation … that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a direct loan." *Id*. § 685.222(b)–(d) (2016); *see also id*. § 668.71(c) (2016) (defining "misrepresentation"). No specific form of evidence was required to meet this standard. The rule also provided ED could adjudicate claims on a group-wide basis when it deemed it appropriate, even absent an application. *Id*. § 685.222(f) (2016).

The 2016 Rule also updated the procedures for obtaining closed school discharges, including by requiring closing schools to provide

borrowers with information about closed school discharges. 34 C.F.R. § 668.14(b)(32) (2016). Students who did not re-enroll in a Title IV-participating institution within three years of their school's closure would be granted "automatic" discharges, without needing to file an application. *Id*. § 685.214(c)(2)(ii) (2016).

Finally, ED added new provisions to Program Participation Agreements related to the resolution of disputes between students and schools. As a condition of receiving Title IV funds, the rule required schools to agree not to rely on predispute agreements that barred students from bringing class actions based on conduct that would also give rise to a borrower defense claim. 34 C.F.R. § 685.300(e) (2016). It also required schools to agree not to enter into or rely on mandatory predispute arbitration agreements with students as to claims based on that conduct. *Id.* § 685.300(f) (2016).

After a federal district court invalidated actions ED's new leadership took to delay the effective date of the rule, the 2016 Rule went into effect in October 2018. *Bauer v. DeVos*, No. 17 Civ. 1330, Minute Order (D.D.C. Oct. 12, 2018); *see Bauer v. DeVos*, 332 F. Supp. 3d 181 (D.D.C. 2018); *Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018).

14

## III. The 2019 Rule

Meanwhile, ED began the process of "revising" the 2016 rule. *See* ED, Notice of proposed rulemaking, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 83 Fed. Reg. 37242, 37248 (July 31, 2018) (JA183). On July 31, 2018, after the statutorily required negotiated rulemaking committee failed to produce a consensus rule, ED issued a notice of proposed rulemaking, in which it proposed rescission of the 2016 final regulations. *Id.* at 37249, 37250 (JA184, 185). During the thirty-day comment period that ended on August 30, 2018, ED received more than 30,000 comments, including significant numbers of comments in opposition on behalf of student and consumer advocates, civil rights organizations, legal services providers, and state and local government officials. *See*, *e.g.*, JA301–1316.

ED issued the 2019 Rule on September 23, 2019. 84 Fed. Reg. 49788 (JA1317). In relevant part, for loans disbursed on or after July 1, 2020, the 2019 Rule:

- Imposed a three-year limitations period on borrowers' ability to raise defenses to repayments based on institutional misrepresentations, whether such defenses were raised via affirmative claims filed with ED or in defense to collection efforts (34 C.F.R. § 685.206(e)(6));

- Imposed a new, stricter standard for asserting defenses to repayment based on misrepresentations, requiring a showing of intent and that borrowers produce written documentation of any such misrepresentation (34 C.F.R. § 685.206(e)(2)–(3), (8)(ii));

- Limited relief based on misrepresentations to situations where borrowers showed "financial harm" other than that associated with student loan debt (34 C.F.R. § 685.206(e)(4), (8)(v));

- Eliminated provisions allowing ED to adjudicate claims on a group-wide basis (*see* 84 Fed. Reg. at 49799–800 (JA1328–29); and

- Eliminated provisions providing for closed school discharges without an application (*see* 84 Fed. Reg. at 49847–48 (JA1376–77)).

For all Title IV-participating institutions, effective July 1, 2020, the 2019 Rule eliminated conditions on the use of forced arbitration clauses and class action bans. *See* 84 Fed. Reg. at 49839–46 (JA1368–75). It also removed the requirement that closing schools notify students of the

16

availability of the closed school discharge process. *See id.* at 49847 (JA1376). The cumulative effect of these provisions was to render it nearly impossible for a borrower to establish a defense to repayment. *Cf. id.* at 49894–95 (JA1373–74) (ED's Regulatory Impact Analysis predicting approximately 90% decline in approval of borrower defense applications).

## IV.   This Litigation

Plaintiff New York Legal Assistance Group (NYLAG) is a nonprofit organization in New York City that provides a variety of free services to low-income New Yorkers in the areas of immigration, government benefits, family law, disability rights, housing law, special education, and consumer debt, among others. JA1518. NYLAG provides a number of services to student loan borrowers who are seeking relief from their debt. NYLAG financial counselors, who are not lawyers, provide information and guidance about a variety of debt relief programs. *Id.* They assist borrowers who are seeking closed school discharges and asserting borrower defenses. *Id.* NYLAG's Consumer Protection Unit and Special Litigation Unit also provides advice and assistance to borrowers seeking

17

closed school discharges and borrower defense relief, and provides legal representation to some borrowers in these processes. *Id.*

On February 19, 2020, NYLAG filed this action challenging the 2019 Rule. The complaint contained four causes of action. The first three causes of action were based on allegations that ED acted without observance of procedure required by law in promulgating the 2019 Rule. First, NYLAG argued that ED failed to comply with the public consultation and negotiated rulemaking requirements of the HEA, 20 U.S.C. § 1098a. JA1501–02. Second, NYLAG contended ED's failure to reopen the comment period on the 2018 NPRM after the 2016 Rule went into effect deprived members of the public of a meaningful opportunity to comment on its proposed rule. JA1502–03. Third, NYLAG claimed that the inclusion of a three-year statute of limitations for "defensive" borrower defense claims in the Final Rule was not a logical outgrowth of ED's proposed rule. JA1503. NYLAG's fourth claim alleged that both the 2019 Rule as a whole, and six specific provisions, were arbitrary and capricious. JA1503–04.

On March 17, 2021, the district court issued an opinion and order resolving the parties' cross-motions for summary judgment. Addressing

each of NYLAG's four causes of action in turn, the district court first concluded that the record did not show that "ED acted in bad faith" in its conduct of the negotiated rulemaking; it therefore entered summary judgment to ED on NYLAG's first cause of action. SPA5–8. Second, the district court found that NYLAG did not establish that ED's failure to reopen comment after the 2016 Rule went into effect was prejudicial and granted summary judgment to ED on NYLAG's second cause of action. SPA9–10. Third, the district court agreed with NYLAG that ED's inclusion of a three-year statute of limitations period for "defensive" borrower defense claims in the 2019 Rule was not a logical outgrowth of the 2018 NPRM, and it therefore granted summary judgment to NYLAG on NYLAG's third cause of action. SPA10–13. Finally, the district court rejected NYLAG's arguments that provisions of the 2019 Rule were arbitrary and capricious, and it granted summary judgment to ED on NYLAG's fourth cause of action. SPA15–21.

The district court then turned to the issue of remedy. While acknowledging that the "usual" remedy for an APA violation is vacatur, it stated that "[a]n agency action found to be arbitrary and capricious may remain in place pending remand to the agency for correction of its

19

defects" in an exercise of the court's equitable discretion. SPA21–22 (citing *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014), and *NRDC v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015) (*NRDC II*)). The court found that remand without vacatur was appropriate because "summary judgment is granted only as to the three-year statute of limitations on defensive claims, while the vast majority of the 2019 Rule remains untouched" and because "there would be some degree of disruption to students asserting borrower defenses under the rule currently in place." SPA22. The court did not discuss the possibility of vacating only the portion of the 2019 Rule that it found unlawful.

In this appeal, NYLAG challenges only the district court's adverse judgment as to the fourth cause of action and its failure to vacate the provision of the rule it found unlawful.

## SUMMARY OF ARGUMENT

ED's 2019 Rule reflects arbitrary and capricious decisionmaking because it relied on speculation about student borrower behavior unsupported by and/or contrary to record evidence, as well as illogical reasoning. Throughout, ED disregarded factual findings that underlay the 2016 Rule, without acknowledging that it was doing so or explaining

20

why. In accepting ED's justifications, the district court failed to conduct the requisite searching scrutiny to ensure ED's assertions were supported by evidence in the record.

**1.** ED's changes to the borrower defense process were not reasoned. The changes were premised on the notion that the 2016 Rule did not adequately deter "frivolous" claims, but ED failed to explain how imposing more difficult substantive and evidentiary standards would decrease the number of non-meritorious claims filed, rather than increase them. And while expressing concerns about the cost of the 2016 regime to taxpayers, ED failed to acknowledge and consider the spillover economic benefits that it had identified in 2016 as a benefit to taxpayers.

Specific changes ED made to the process were not supported by reasoned consideration. There is no support for ED's assertion that the 2019 requirements that borrower defense claimants show that a school's misrepresentation was intentional and provide written evidence of that misrepresentation will cause students to become "more educated consumers." Evidence submitted by commenters, and ED's own factual findings in 2016, establish the opposite: that requiring evidence of intentional misrepresentation will make the borrower defense claim

21

process implausible for most borrowers, even those who were defrauded, and that no amount of "education" can correct the power and informational asymmetry between predatory schools and student borrowers. ED did not address this evidence or explain its reversal from 2016.

ED's new "financial harm" requirement also was based on illogical speculation. This provision denies student borrowers any relief, even if they have shown they relied on a documented intentional misrepresentation by a school, as required by the new standards, unless the student *also* produces evidence that they were financially harmed beyond their student loan debt and lost opportunity cost. ED claimed that this requirement is necessary to deter "unsubstantiated claims," but there is no connection between the two: definitionally, a student with an unsubstantiated claim will not obtain relief, whether they show financial harm or not. The only borrowers who will be impacted by the financial harm requirement are those who have *meritorious* claims. Further, ED did not acknowledge or address the reasons it gave in 2016 for refusing to require students show additional harm.

In eliminating ED's discretionary ability to resolve borrower defense claims on a groupwide basis, ED failed to consider the benefits of such groupwide assessment that it acknowledged in 2016 and was identified by commenters in the 2019 rulemaking. Its suggestions that the claims process is easy, and that the group claims process somehow encouraged "outside actors" to seek personal gain, have no support in the record. Moreover, it is inconsistent with ED's repeated assertion that individual claims processing was too burdensome for the department.

**2.** ED's elimination of mandatory automatic closed school discharges and mandatory disclosures relating to the closed school discharge process ignored the fact that these provisions, adopted in 2016, were designed to address the fact that nearly half of all students eligible for discharges under the statute do not apply for them. The reasons ED gave for eliminating the provisions were illogical. There is no evidence that students do not complete their educations because they will have their loans discharged if they choose not to do so for three years. And ED's unexplained assertion that it was not the responsibility of taxpayer-funded institutions that were closing and abandoning students mid-

degree to share information about the process is not a reasoned explanation for a reversal of its 2016 position.

**3.** ED's rescission of conditions on the use of mandatory arbitration clauses and class-action waivers was based on conclusions about the costs and benefits of such provisions not supported by relevant evidence. ED based its conclusions on unreliable materials concerning commercial arbitration and mass-tort litigation, while ignoring evidence from the student-loan context and consumer experience more generally. ED also failed to acknowledge, much less address, its 2016 conclusions as to the benefits to taxpayers of these provisions.

**4.** Finally, the district court erred in failing to vacate the portion of the 2019 Rule it deemed unlawful: the statute of limitations for "defensive" borrower defense claims. Although that provision is plainly severable from the rest of the 2019 Rule, the district court mistakenly considered only whether vacatur of the entire 2019 Rule was warranted. Because the flaw identified by the district court was serious, and because vacating the unlawful provision would have no disruptive impact, vacatur of that provision is the appropriate remedy.

## STANDARD OF REVIEW

"On appeal from a grant of summary judgment involving a claim brought under the Administrative Procedure Act, [this Court] review[s] the administrative record *de novo* without according deference to the decision of the district court." *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007).

A district court's decision to remand without vacatur is reviewed for abuse of discretion. *See Stand Up for Cal.! v. U.S. Dep't of Interior*, 879 F.3d 1177, 1190 (D.C. Cir. 2018) (reviewing district court's remand without vacatur for abuse of discretion); *NRDC II*, 808 F.3d at 584 (noting remand without vacatur is appropriate "when equity demands"). A district court abuses its discretion where it bases its decision on an "erroneous view of the law." *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 564 n.2 (2014) (citation omitted).

## ARGUMENT

### I.     The 2019 Rule is arbitrary and capricious.

"An agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Alzokari v. Pompeo*, 973 F.3d 65, 70 (2d Cir. 2020) (quoting *NRDC v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (*NRDC I*)). Where, as here, an agency is changing its existing position, the requirement of reasoned decisionmaking requires the agency to at least "display awareness that it is changing position," and "show that there are good reasons for the new policy." *Fox*, 556 U.S. at 515. "If the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' the agency must offer 'a reasoned explanation for disregarding facts and circumstances that underlay the prior policy.'" *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019) (quoting *Fox*, 556 U.S. at 515–16) (internal marks omitted)).

In assessing whether an agency has met these standards, "a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. "But 'this is not to suggest that judicial review of agency action is merely perfunctory. To the contrary, within the prescribed narrow sphere, judicial inquiry must be searching and careful.'" *New York v. U.S.*

26

*Dep't of Homeland Sec.*, 969 F.3d 42, 81 (2d Cir. 2020) (quoting *Islander E. Pipeline*, 525 F.3d at 151 (internal quotation marks omitted)).

Here, a "searching and careful" review of the record shows that ED did not meet the APA standard of reasoned decisionmaking in adopting the 2019 Rule. ED's contemporaneous reasoning in support of the 2019 Rule was inconsistent with the record, replete with illogical, unsupported, and conclusory statements, and failed to include meaningful justification for its departures from both the policy and the factual determinations contained in the 2016 Rule. As highlighted by the provisions discussed below, these deficiencies were pervasive and warrant vacatur of the 2019 Rule.

## A. Changes to the claims process and standard for relief were arbitrary and capricious.

The 2019 Rule radically changed the process by which students could seek and obtain borrower defense relief, as well as the substantive standard ED would apply in adjudicating borrower defense applications. Both ED's proffered justification for the need to make it harder for students to obtain relief, and the specific mechanisms it adopted to do so, reflect arbitrary and capricious decisionmaking.

### 1. ED's explanation of why changes were necessary was irrational and unsupported by the record.

ED premised the 2019 Rule's borrower defense provisions on the generic notion that the 2016 Rule did not achieve the appropriate "balance" between "the interests of students with those of taxpayers." 84 Fed. Reg. at 49794 (JA1323). The specific concerns ED identified, however, lacked support in the record and reflect that ED's desire to make it more difficult for students to obtain borrower defense relief was a "solution in search of a problem." *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 545–46 (S.D.N.Y. 2019).

**First**, ED stated that it needed to revise the borrower defense process set forth in the 2016 Rule because the process failed to adequately deter "frivolous" claims. 84 Fed. Reg. at 49800–01 (JA1329–30); *see also id.* at 49888 (JA1417) (noting agency's adoption of "certain limits and conditions to prevent frivolous or stale claims"). ED defined "frivolous" claims as those "that allege misrepresentations that actually did not occur, that seek discharge from private rather than Federal loans, or that seek relief from a school not associated with any of the borrower's current underlying loans." *Id.* at 49800 (JA1329). ED claimed that it had denied 9,000 borrower defense claims on these grounds as of the date of the Final

28

Rule, and that having to review and deny these "frivolous" claims was a waste of resources. *Id.* at 49801 (JA1329–30). The facts, however, bely ED's assertion. Rather than expend resources resolving any borrower defense claims filed under the 2016 Rule, ED "issued no decisions at all" between June 2018—before the 2016 Rule went into effect—and December 2019—after it published the 2019 Rule. *Sweet v. DeVos*, 495 F. Supp. 3d 835, 839 (N.D. Cal. 2020).

Even if its claims were true, ED failed to explain how making the standards for relief *higher* would address the problem of receiving claims that did not meet the lower standard. The 9,000 frivolous claims submitted under the 2016 Rule would face the same result under the 2019 Rule: denials. *Cf.* 2016 Rule, 81 Fed. Reg. at 75936 (JA23) (rejecting argument that 2016 Rule would encourage frivolous claims because "[b]orrower defense claims that do not meet the evidentiary standard will be denied"). And there is no reason to believe that changing the standard would reduce administrative burden in dealing with frivolous claims: As commenters explained, a borrower who did not qualify under the 2016 Rule but nonetheless submitted a frivolous claim would likely submit that same frivolous claim under the 2019 Rule. *See* Comments of

29

National Consumer Law Center and other legal aid organizations (Legal Aid Comment), JA417–18 (explaining flaws in agency's justification). If anything, *more* claims will be filed and denied under the 2019 Rule, because ED has created more reasons to deny claims, thus expanding the definition of what might be considered frivolous yet doing nothing to actually deter filing. The district court did not address this argument. *See* SPA15–16. Because ED has not demonstrated a "rational connection between the facts found and the choice made," it acted arbitrarily and capriciously. *State Farm*, 463 U.S. at 43.

**Second**, throughout the Rule, ED claimed that making it more difficult to obtain relief served its interest in protecting "taxpayers who ultimately will bear the costs if there are high volumes of discharges." 84 Fed. Reg. at 49817 (JA1346); *see also* 84 Fed. Reg. at 49819, 49822, 49825, 49826, 49832, 49834, 49848 (JA1348, 1351, 1354, 1355, 1361, 1363, 1377) (referencing savings to taxpayers). Although economic costs are legitimate for ED to consider, ED failed to consider the corresponding economic benefits of loan discharges. In this way, it failed to consider an obviously relevant factor—one that it had acknowledged in the 2016 Rule. As ED had stated in the 2016 Rule, loan discharges have benefits

to taxpayers and the economy at large via "spillover economic benefits." *See* 81 Fed. Reg. at 76051 (JA138). ED explained that increasing the availability of loan discharges would allow borrowers "to become bigger participants in the economy, possibly buying a home, saving for retirement, or paying for other expenses," benefitting not just the individual borrowers, but the larger economy. *Id.* Although numerous commenters raised this issue in response to the 2018 NPRM, ED did not address it anywhere in the 2019 Rule. *See*, *e.g.*, Comment of Ctr. for Responsible Lending (CRL), JA364–65; Comment of Nat'l Student Legal Def. Network (NSLDN) II, JA762; Comment of Lawyers' Cmte. for Civ. Rts. Under Law, JA384 (26266); Comment of N.Y. State Higher Ed. Servs. Corp., JA844–85; Comment of Nat'l Ass'n of State Student Grant & Aid Programs, JA399. The district court did not address this argument. *See* SPA16. But because ED neither considered these spillover economic benefits nor provided an explanation as to why it was disregarding the factual findings that underlay its prior policy, it acted arbitrarily and capriciously. *See Fox*, 556 U.S. at 515–16.

### 2. The 2019 evidentiary and substantive standard reflects arbitrary and capricious decisionmaking.

Under the 2016 Rule, a borrower is entitled to relief upon a showing of a "substantial misrepresentation" by a school, which includes both intentional falsehoods and "any statement that has the likelihood or tendency to mislead under the circumstances," including statements that "omit[] information in such a way as to make the statement false, erroneous, or misleading." 34 C.F.R. § 668.71(c) (2016). In the 2019 Rule, ED made two changes to this standard that work together to make it nearly impossible for borrowers to establish substantial misrepresentation. First, ED adopted a "more stringent definition of misrepresentation" that requires a student to present, as a condition for obtaining relief, evidence of an institution's intent to mislead or its reckless disregard for the truth. 84 Fed. Reg. at 49804–05 (JA1333–34) (discussing § 685.206(e)(3)). Second, ED imposed a new "documentation" requirement. "[A] borrower's affidavit or sworn testimony" as to misrepresentations made to that borrower no longer constitutes sufficient evidence; rather, borrowers must produce evidence in form of a written misrepresentation from the school. *Id.* at 49817–18 (JA1346–47) (discussing § 685.206(e)(8)(ii)). A searching review of the record as

32

required by the APA shows that, contrary to the district court's single sentence stating otherwise, SPA16, the explanations ED provided have no support in the record and, indeed, are directly contradicted by the record and ED's prior findings.

ED justified these changes on the ground that they were "appropriate so that borrowers shop wisely, take personal responsibility for seeking the best information available and make informed choices." 84 Fed. Reg. at 49817 (JA1346) (addressing overall standard); *see also id.* (stating that the documentation requirement would "play an important role in helping borrowers become more educated consumers"). This explanation echoes ED's suggestions throughout the 2019 Rule that borrower defense claims based on deception, misrepresentation, and fraud were the result of students not being "wise consumers." *Id.* at 49818 (JA1347); *see also id.* at 49794 (JA1323) (explaining that the changes overall reflect that "[s]tudents are not passive victims; they take an active role in making informed decisions"); *id.* at 49816 (JA1345) (stating that "it is incumbent upon students to shop wisely"). This reasoning is arbitrary and capricious both because it relies on an unexplained departure from ED's 2016 findings, and because it is "speculative, and

33

based purely on assumptions not supported by the record." *NRDC v. EPA*, 961 F.3d 160, 177 n.7 (2d Cir. 2020) (*NRDC III*); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (finding rule arbitrary and capricious where agency did not meet its "duty to explain why it deemed it necessary to overrule its previous position").

ED stated in 2019 that the intent requirement would not be problematic because students may insist that, during enrollment, institutions provide them with "written representations and documentation." 84 Fed. Reg. at 49807 (JA1336). In 2016, however, ED had rejected that assertion as unrealistic. At that time, ED refused to adopt a requirement that borrowers provide evidence of intent, in recognition of the fact that "[g]athering evidence of intent would likely be nearly impossible for borrowers. Information asymmetry between borrowers and institutions, which are likely in control of the best evidence of intentionality of misrepresentations, would render borrower defense claims implausible for most borrowers." 81 Fed. Reg. at 75937 (JA24). If ED changed its mind, the agency was required to acknowledge the flip-flop and explain why. *Cf. Fox*, 556 U.S. at 515. Because it failed to do so, its action was arbitrary and capricious.

Even if ED had acknowledged and attempted to explain this reversal, the reversal is not supported by the record. Nothing in the record suggests that the problem that led to the need for borrower defense regulations—widespread deceptive conduct by predatory institutions resulting in massive amounts of student debt—is caused by students failing to take responsibility, or that students have the power to force institutions to put their representations in writing. To the contrary, the record establishes that institutions often engage in high-pressure sales tactics with prospective students who lack bargaining power to force institutions to do anything. *See*, *e.g.*, Comment of Cal. Att'y Gen.'s Office on behalf of a coalition of 20 states (AGs Comment), JA341–42; Legal Aid Comment, JA436, 445–46; Comment of Public Citizen, JA869–70; Comment of TICAS, JA1276. This unequal power dynamic and the resulting crisis was the very impetus for the 2016 Rule, which, as ED explained at the time, sought to "even[] the playing field for students," 81 Fed. Reg. at 75962 (JA49).

Further, there is no reason to believe that increasing the evidentiary burden to raise a defense to repayment of student loans years *after* the student enrolled in a school would lead students (or schools) to

35

change their behavior on the front end. Students take out federal loans because they want to better their lives and get a valuable education. Nothing in the record indicates that students are even *aware* of the possibility of submitting a borrower defense claim at the enrollment stage, much less that they make the choice whether to enroll in a particular institution based on that possibility. ED's mere "conjecture cannot substitute for a reasoned explanation." *Graphic Commc'ns Int'l Union, Loc. 554 v. Salem-Gravure Div. of World Color Press, Inc.*, 843 F.2d 1490, 1494 (D.C. Cir. 1988).

### 3. The 2019 Rule's financial harm requirement is arbitrary and capricious.

Even if a student is, despite ED's expectation as stated in 2016, able to produce written evidence of an institution's misrepresentation that induced them to enroll and take out a federal loan, the 2019 Rule contains still another unjustified obstacle to borrower defense relief: a requirement that a borrower show financial harm *in addition to* the student-loan debt that they accrued based on a misrepresentation. 84 Fed. Reg. at 49818–21 (JA1347–50) (discussing 34 C.F.R. §§ 685.206(e)(4), (8)). Moreover, the borrower must affirmatively show that such additional harm "is not predominantly due to intervening local,

36

regional, or national economic or labor market conditions" and that it does not "arise from the borrower's voluntary decision to pursue less than full-time work or not to work or result from a voluntary change in occupation." 34 C.F.R. § 685.206(e)(4). In addressing the financial harm provision, the district court did not address any of NYLAG's specific arguments. *See* SPA15–16.

ED's adoption of an independent financial harm requirement was *not* based on a change in the agency's position that student loan debt incurred based on misrepresentations is itself a serious injury, as recognized in the 2016 Rule. *See* 81 Fed. Reg. at 76051 (JA138). As ED had explained then, "high levels of student debt may decrease the long-term probability of marriage, increase the probability of bankruptcy, reduce home ownership rates, and increase credit constraints, especially for students who drop out." *Id.* And for borrowers who default, "everyday activities like signing up for utilities, obtaining insurance, or renting an apartment can become a challenge." *Id.*; *see also* AGs Comment, JA343–44; *see also* CRL Comment, JA371–72; Legal Aid Comment, JA431. The 2019 Rule does not disavow this position. Nor did ED question its earlier recognition of the opportunity costs to students associated with the choice

to attend a given institution. *See* 81 Fed. Reg. at 75978 (JA65) ("When a student makes the choice to attend an institution, he is also choosing to spend his time in a way that may require him to take out Federal loans for living expenses, and very likely to forgo the opportunity to work to defray those costs from earnings.").

Rather, ED's sole proffered justification was that this new requirement was a "necessary deterrent to unsubstantiated claims," such as claims predicated upon "disappointments through their college experience and career, such as believing that they would have been better served by a different institution or major." 84 Fed. Reg. at 49819 (JA1348); *see also id.* (claiming financial harm requirement necessary to prevent claims based on student dissatisfaction with dorm rooms). To begin with, ED did not acknowledge that it rejected this same theory in 2016 when, in declining to require proof of damages, ED recognized that "the denial of any identifiable element or quality of a program that is promised but not delivered due to a misrepresentation" is itself a detriment. *See* 81 Fed. Reg. at 75951 (JA38) (rejecting suggestion that claimants be required to show "damages"). ED's failure to acknowledge

and explain the change in position is alone a basis to vacate the financial harm requirement. *See Encino Motorcars*, 136 S. Ct. at 2126.

Even if ED were writing on a clean slate, though, no evidence in the record demonstrates that students file borrower defense claims simply because they are "disappointed" by their "college experience." Further, a "financial harm" requirement would bear no rational relationship to that problem if it did exist. Under both the 2019 Rule and the 2016 Rule, a student is not entitled to borrower defense relief because they are "disappointed." Even without the financial harm requirement, borrowers are entitled to relief only if they show that their school made an intentional misrepresentation of "material fact" "that directly and clearly relates to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made." 34 C.F.R. §§ 685.206(e)(2)(i), (e)(3); *see also* 2016 Rule, 81 Fed. Reg. at 75950 (JA37) (noting that a borrower would be required to show detrimental reliance on a misrepresentation "related to information to which the borrower would reasonably attach importance in making the decision to enroll or continue enrollment at the school"). The "financial harm" requirement, by definition, applies only to borrowers who *have* produced written

evidence of intentional misrepresentations of material fact—not the "unsubstantiated" claims that ED claims it sought to prevent.

As ED conceded, the only relief it can provide students who are intentionally misled as to material facts relating to their enrollment is discharge of their federal loan debt and refunds of amounts paid. 84 Fed. Reg. at 49818 (JA1347). ED provided no logical basis to require borrowers to show that they suffered harm beyond that debt to obtain relief from that debt.

### 4. ED's elimination of the group claims process was arbitrary and capricious.

The 2016 Rule contained a process by which ED could decide borrower defense claims raising common issues on a groupwide basis, where, in its discretion, it deemed such resolution appropriate. 34 C.F.R. § 685.222(f)–(h) (2016). For loans disbursed after July 1, 2020, ED eliminated this provision in its entirety. *See* 84 Fed. Reg. at 49798–800 (JA1327–29); 34 C.F.R. § 685.222 (2019). In doing so, ED failed to give meaningful consideration to how this change negatively impacted borrowers. "[A]n agency explanation will not be afforded deference unless the agency has considered all relevant issues and factors." *Long Island Head Start Child Dev. Servs. v. NLRB*, 460 F.3d 254, 258 (2d Cir. 2006)

(citing *State Farm*, 463 U.S. at 48–49). And ED also explicitly relied on an illogical, spurious accusation about fictitious "outside actors" to justify the change. The change was thus arbitrary and capricious, and requires vacatur.

**First**, ED failed to meaningfully consider the benefits of the group claims process. In 2016, ED concluded that having the discretion to resolve claims on a group basis would "facilitate the efficient and timely adjudication of not only borrower defense claims for large numbers of borrowers with common facts and claims, but [would] also conserve the Department's administrative resources." 81 Fed. Reg. at 75965 (JA52); *see also id.* at 75959 (JA46) (stating that borrowers "may receive a faster decision using the group process"). In the 2019 rulemaking, commenters expanded on this point, with legal services providers and state and local governments explaining how the availability of the group claims process aids students and taxpayers. *See*, *e.g.*, Legal Aid Comment, JA448–52; AGs Comment, JA348–49; Comment of N.Y.C. Dep't of Consumer Affs., JA837. As one comment explained, to "require each borrower subject to the same school misconduct to independently apply for and prove their borrower defense claim would mean that most borrowers who have been

41

cheated and have meritorious borrower defenses will never get relief, simply because they do not know about their right to relief, how to prove their claim, or how to navigate the borrower defense process." Legal Aid Comment, JA448. Commenters did not suggest groupwide adjudication would be appropriate in all, or most circumstances, but noted that allowing ED to do so where appropriate would "promote[] equity by ensuring that borrowers subjected to the same misconduct are treated the same by the Department," while relieving individuals (and service providers like NYLAG) of the burden associated with filing individual applications, and ED of the burden of reviewing and processing individual applications based on the same evidence. *Id.* at JA449.

In the 2019 Rule, ED did not address these commenters' concerns about equity at all. Its only response to these comments was to dismiss the notion that it was burdensome to require each borrower to complete an individual application. In so doing, it ignored the point made by commenters that most students are not even *aware* of the possibility of borrower defense relief. *See, e.g.*, *id.* Moreover, ED minimized the burden imposed by the new rule, on the ground that student borrowers must sign "a Master Promissory Note—a complicated legal document—as well as

42

other documents in order to obtain a student loan," and thus could be expected to have no more difficulty completing borrower defense applications. 84 Fed. Reg. at 49799 (JA1328). It is completely illogical to compare signing a master promissory note—which requires a borrower to provide no more than a signature—to the complicated application process ED created in the 2019 Rule, 34 C.F.R. § 685.206(e)(8), which requires students to gather and present affirmative evidence as to both intentional misrepresentation and "financial harm," as discussed above.

Furthermore, the rulemaking record established that students largely do *not* understand the terms and conditions of their Master Promissory Notes and are often pressured to sign such documents quickly and without understanding them. *See*, *e.g.*, Legal Aid Comment, JA439; CRL Comment, JA379 (citing CFPB complaint alleging such conduct by one school); Public Citizen Comment, JA869–71 (collecting citations to student experiences and discussing social science research); *see also* JA906–75 (borrower declarations regarding experiences and examples of enrollment materials). As one comment explained, "clients targeted by fraudulent, for-profit schools are the least prepared to navigate the Department's forms and systems, even when those forms and systems

43

are significantly simpler than those likely to be involved in borrower defense." Legal Aid Comment, JA415. ED's repeated assertions that students will be able to complete applications unaided are belied by comments in the record as to borrower experiences, *see*, *e.g.*, *id.* at JA427–28, 484; Comment of TICAS on behalf of Coalition of 80 Organizations, JA1270, as well as ED's own recognition that students will benefit from assistance from legal aid and other organizations, *see*, *e.g.*, 84 Fed. Reg. at 49828 (JA1357). ED's illogical dismissal of the difficulties individual borrowers face shows it did not meaningfully consider the benefits of the group claims process and, thus, acted arbitrarily and capriciously.

**Second**, ED justified its elimination of the group claims process by referencing unspecified "evidence of outside actors attempting to personally gain from the bad acts of institutions" as a reason to eliminate the group claims process. *Id.* at 49798 (JA1327). ED did not identify these actors or explain how the group resolution of administrative claims (which contained no attorney fee-shifting or analogous provision) allowed them to "personally gain" in ways that individual claims would not. No evidence in the record shows that anyone manipulated the group claims process created by the 2016 Rule, or even that ED employed the process

44

*at all*. A reviewing court "can hardly accept an agency's reliance on 'evidence' that is itself mere speculation." *Detsel v. Sullivan*, 895 F.2d 58, 64 (2d Cir. 1990).

The district court found the complete lack of support for this reason for eliminating the group claims process irrelevant, due to ED's "other expressed justifications, supported by the record." SPA17 (citing *NRDC III*, 961 F.3d at 170). But "when an agency relies on multiple grounds for its decision, some of which are invalid," a court "may only sustain the decision where one is valid and the agency would clearly have acted on that ground even if the other were unavailable." *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 330 (D.C. Cir. 2006) (internal quotation marks omitted). This standard has not been met. The prominence of ED's concocted concern about "outside actors" throughout the 2019 Rule, not just in this provision, indicates that this speculative theory was a major force behind the rule. *See*, *e.g.*, 84 Fed. Reg. at 49816 (JA1345) (expressing concern about "unscrupulous third parties"); *id.* at 49844 (JA1373–74) (stating that class action lawsuits benefit "lawyers and not wronged students"). Thus, the proper course is to vacate and remand to the agency. *See*, *e.g.*, *Fogo De Chao (Holdings) Inc. v. U.S. Dep't*

45

*of Homeland Sec.*, 769 F.3d 1127, 1149 (D.C. Cir. 2014); *Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 44–45 (D.C. Cir. 2004).

### B.   ED's elimination of automatic closed school discharges and related disclosures was arbitrary and capricious.

Apart from its changes to the process for obtaining borrower defense discharges, ED also rescinded two provisions of the 2016 Rule that it had adopted to address the fact that "large numbers of borrowers who qualify for" closed school discharges under the HEA did not receive, or even apply for such discharges, under the existing regime. 81 Fed. Reg. at 76039 (JA126). In 2016, ED found that, between 2008 and 2011, *forty-seven percent* of borrowers who were eligible for closed school discharges under the statute had never applied for and/or received one. *Id*. at 76059 (JA146). As commenters noted in 2018, this data reflects that borrowers are largely unaware of the possibility of closed school discharges. *See* Comment of NYLAG, JA843; Legal Aid Comment, JA488–89. In 2016, ED addressed this problem in two ways. First, it provided that ED would automatically discharge the loans of students who did not re-enroll in any Title IV-eligible institution within three years of closure of the school they had previously attended, without requiring them to submit an

46

application. 34 C.F.R. § 685.214(c)(2)(ii) (2016). Second, it required closing schools to affirmatively notify students about the (not-automatic) closed school discharge process. *See* 34 C.F.R. § 668.14(b)(32) (2016).

In rescinding these provisions in 2019, ED provided no explanation as to why it was no longer concerned about the problem of eligible borrowers not applying for the closed school discharges to which they are legally entitled—itself a basis for remand and vacatur. The reasons it *did* give for rescinding each provision were also illogical and unsupported by the record.

ED's sole rationale for eliminating the automatic closed school discharge provision was that such discharges were contrary to the "goals" of encouraging students to complete their educational programs. 84 Fed. Reg. at 49847. Although the district court deferred to ED's conclusion, JA1376, ED offered no evidence that the availability of a discharge in three years encourages students to pass up the opportunity to pursue another educational program and accrue interest on their loans in the interim. To the contrary, the record shows that borrowers have no idea this option exists, and also highlights a number of other factors that may

cause students to neither participate in a "teach-out"[1] nor pursue other educational opportunities in the intervening three years after their school closes—including lack of opportunity, good faith attempts to work to pay off debts, or lost interest in education because of the negative experience associated with taking out loans for a worthless educational program. *See*, *e.g.,* NYLAG Comment, JA842; Legal Aid Comment, JA488–50; Comment of New Am., JA813–814. ED failed to address this evidence.

Moreover, even if ED's conclusion that automatic discharges somehow discouraged students from furthering their education were rational, ED was nonetheless required to consider the benefits associated with automatic closed school discharges. Instead, ED irrationally dismissed what it acknowledged in 2016 to be the "important benefit to borrowers" that comes from not requiring students to file an application to vindicate their statutory right to a discharge. 81 Fed. Reg. at 76038 (JA125). As commenters explained to ED in 2018, the closed school discharge application process is extremely burdensome, and the

---

[1] A "teach-out" is an arrangement between the closing school and an another institution that allows students of the closing school to complete their course of study. *See* 34 C.F.R. § 600.2.

48

automatic process removes that barrier to relief. *See*, *e.g.*, Legal Aid Comment, JA484–85 (explaining, in detail, why process is difficult for students to navigate, based on legal service provider experiences). And the fact that nearly half of all eligible students do *not* seek discharges is strong evidence that it is not a simple process. ED's assertion—that "[t]he application process for a closed school discharge is not overly burdensome or difficult to navigate," 84 Fed. Reg. at 49847 (JA1376)—has no support in the record and merits no deference. *See*, *e.g.*, *Safe Extensions, Inc. v. FAA,* 509 F.3d 593, 595 (D.C. Cir. 2007) (vacating action where agency justified decision with "bare assertions unsupported by any actual evidence").

ED's rescission of the disclosure requirement also failed to meet the requirements of reasoned decisionmaking.[2] Its sole justification for this change was that it is "the Department's, not the school's burden to provide this information to students." 84 Fed. Reg. at 49847 (JA1376). This statement ignores that the purpose of "Institutional Accountability"

---

[2] While the district court noted NYLAG's challenge to the rescission of this provision, its opinion did not address ED's reasoning. *See* SPA21 (stating that the change was not arbitrary and capricious, but discussing only the reasons for eliminating automatic closed school discharges).

regulations like the 2016 and 2019 Rule is to hold accountable schools that have engaged in practices that have led to massive debt for students at taxpayer expense. ED did not explain why it was wrong to require schools that rely on federal loan money to inform students of their statutory rights when those schools decide to shut down, just as these schools have to inform students of any number of statutory and regulatory rights. *See*, *e.g.*, 34 C.F.R. § 99.7(a)(1) (requiring annual notification of privacy rights); 34 C.F.R. § 668.14(b)(29) (requiring institution to make available information about federal aid programs); 34 C.F.R. § 668.41 (c)–(g) (requiring range of disclosures to enrolled and prospective students). Notably, ED did not suggest that informing students of the availability of closed school discharges posed a significant additional burden on closing schools, which have to provide teach-out information to students regardless. *See* 34 C.F.R. § 602.24(c). The rescission of the disclosure requirement is also inconsistent with the view expressed throughout the 2019 Rule, *see supra* pp. 33–34, that providing students with information is key to their ability to succeed. As ED stated in the 2016 Rule, closed school disclosures would help "the borrower to make an informed decision based on full knowledge of the borrower's

50

options." 81 Fed. Reg. at 76034 (JA121); *see also id.* ("all such borrowers should receive this information, so that they have full knowledge of their options."). And evidence in the record showed that without a mandatory disclosure requirement, closing schools provided inaccurate, misleading, and/or incomplete information to borrowers. *See* Legal Aid Comment, JA489. To require disclosure of additional truthful information about statutory rights does not impose a meaningful burden on these schools—and certainly does not outweigh the benefit, which ED simply ignored.

ED did not acknowledge, much less address, the obvious cumulative effect of eliminating the requirement that schools disclose to students that they can file closed school discharge claims, while at the same time eliminating the availability of automatic relief. Nor did the district court. The harm to students who lack knowledge that they are eligible for closed school discharges, as provided by statute, is made worse by requiring them to affirmatively seek relief in all situations. ED's elimination of each of these provisions was arbitrary and capricious.

**C.    The rescission of conditions on the use of pre-dispute arbitration agreements and class action waivers was arbitrary and capricious.**

In 2016, ED made extensive findings about the impact of the mandatory pre-dispute arbitration agreements and class-action waivers that schools routinely included in enrollment agreements with student borrowers. ED concluded that "widespread use of mandatory arbitration agreements effectively masked serious misconduct later uncovered in government enforcement actions, while providing minimal relief for students," and that such agreements "jeopardize the taxpayer investment in Direct Loans" and "frustrate Federal interests and Direct Loan Program objectives." 81 Fed. Reg. at 76022, 76022 n.75, 76023 (JA109, 109 n.75, 110). Similarly, ED found that some institutions "aggressively used class action waivers to thwart actions by students for the very same abusive conduct that government agencies, including [ED], eventually pursued," and "that the waivers effectively removed any deterrent effect that the risk of such lawsuits would have provided." *Id.* at 76022 (JA109). It thus concluded that "class action waivers for [claims by students] substantially harm the financial interest of the United

States and thwart achievement of the purpose of the Direct Loan Program." *Id.*

Accordingly, the 2016 Rule conditioned participation in ED's Title IV programs on schools' agreement not to impose or invoke mandatory pre-dispute arbitration agreements and class action waivers on or against students. 34 C.F.R. § 685.300(e)–(f) (2016). ED determined that these conditions would "enable more borrowers to pursue a determination of wrongdoing on the part of an institution individually or as part of a class." 81 Fed. Reg. at 75939 (JA26).

The 2019 Rule replaced those conditions with a requirement that schools could use, but must disclose, such provisions. 34 C.F.R. § 668.41(h); *id.* § 685.304. ED based this change on the conclusion that "arbitration agreements and class action waivers, when coupled with student protections promoting informed decision making, preserve reasonable transparency, and cooperative dispute resolution potential that is positive for both students and institutions." 84 Fed. Reg. at 49840 (JA1369). ED did not mention that it previously found such provisions to be financially harmful to taxpayers. Because this conclusion is an inadequately explained departure from ED's 2016 findings, and contrary

to the record, ED's rescission of these conditions was arbitrary and capricious.

As to mandatory arbitration provisions, ED's sole support for its new position that mandatory arbitration agreements are beneficial for students was a 2012 promotional pamphlet published by the American Bar Association's Section of Dispute Resolution entitled the "Benefits of Arbitration for Commercial Disputes." *Id.* at 49841 (JA1370) (citing JA266). That pamphlet, in which alternative dispute resolution professionals extolled the perks of alternative dispute resolution in disputes between businesses, *see* JA268–75, was not a sufficient basis to disregard the record evidence concluding that mandatory arbitration agreements in the student-loan context hurts students and taxpayers, for several reasons.

Although agencies are not barred from extrapolating, they "must fully explain the assumptions" underlying such extrapolations. *Mo. Public Serv. Comm'n v. FERC*, 337 F.3d 1066, 1070 (D.C. Cir. 2003) (citations omitted), and a court will uphold a decision only if it is "based on reasonable extrapolations from some reliable evidence," *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 437

F.3d 75, 83 (D.C. Cir. 2006). Here, ED did not even acknowledge that it was extrapolating from information addressing a different context. Moreover, there was no basis to extrapolate the pamphlet's discussion of experiences in business-to-business arbitration to the student-borrower context. As the record showed, there are obvious and important differences between commercial and consumer arbitration agreements, in terms of the formation of contracts and the outcomes of arbitration.

First, unlike commercial arbitration, arbitration between a student borrower and the student's school is not the result of a mutual agreement between equals. Notably, the 2016 Rule did not prohibit borrowers and schools from agreeing to arbitrate disputes. It only put conditions on the use of mandatory pre-dispute arbitration clauses, which, unlike the typical commercial agreement to arbitrate, are presented in adhesion contracts entered into by unsophisticated parties, without legal representation, as part of high-pressure sales pitches. *See* 2016 Rule, 81 Fed. Reg. at 76025 (JA112) ("[T]he regulations do not ban arbitration."); *see also* Comment of Am. Ass'n for Justice, JA313–20 (noting problems associated with adhesion contracts, unique to the consumer context); Legal Aid Comment, JA462–63 (same); Public Citizen Comment, JA886–

87 (same). The ubiquity of these features in the student borrower context was well-documented in the record by examples of form arbitration provisions and statements from recruiters and borrowers as to how these provisions are presented to students. *See*, *e.g.*, CRL Comment JA372 (quoting for-profit college recruiter); Public Citizen Comment, JA868–70, 882 (discussing student and recruiter testimony and attached declarations); JA1002–1258 (samples of arbitration clauses). Commenters also cited studies that showed that consumers do not understand arbitration agreements. *See*, *e.g.*, JA868 (citing Jeff Sovern, et al., *"Whimsy Little Contracts" with Unexpected Consequences: An Empirical Analysis of Consumer Understanding of Arbitration Agreements*, 75 Md. L. Rev. 1, 45 (2015)); JA880 (citing Debra Pogrund Stark & Jessica M. Choplin, *A License to Deceive: Enforcing Contractual Myths Despite Consumer Psychological Realities*, 5 N.Y.U. J.L. & Bus. 617, 627, 678-79 (2009)). No rational decisionmaker could consider this evidence and conclude that experiences between businesses that agree to arbitrate can be extrapolated to that of student borrowers.

Second, putting aside the issues about the lack of meaningful assent to arbitrate, commercial arbitration proceedings do not raise the

same concerns as those raised by ED in the 2016 Rule, which ED ignored in 2019. As ED explained in 2016, the use of mandatory arbitration clauses has allowed taxpayer-funded schools to hide their misconduct, contrary to the federal interest in exposing such misconduct. *See* 81 Fed. Reg. at 76022 (JA109); *see also* Legal Aid Comment, JA461–64. This interest does not exist in the typical commercial context. In addition, evidence shows that student borrowers rarely obtain meaningful relief in arbitral proceedings—even in situations where courts and government agencies later agree they had been defrauded. *See*, *e.g.*, Public Citizen Comment, JA850–859; Legal Aid Comment, JA459–60; Am. Ass'n of Justice Comment, JA315–16.

This was not a situation where extrapolation was necessary because there was no evidence about how mandatory arbitration works in the consumer context more generally, and in the higher education context specifically. To the contrary, ED simply refused to consider that more relevant evidence. ED explicitly rejected a Department of Defense report on the impacts of arbitration agreements as irrelevant because it focused on different types of consumer loans. 84 Fed. Reg. at 49842 (JA1371) (declining to consider conclusions of report that examined

"payday loans, car title loans, tax refund anticipations loans, and unsecured loans" as not "applicable" to student loan context). *Cf. id.* at 49801 (JA1330) (refusing to give credence to social science research on consumer financial products on the grounds it was not "an apples-to-apples comparison.").[3] Rejecting as irrelevant a study about consumer arbitration, while extrapolating (without acknowledging as such) from a promotional pamphlet about commercial arbitration is arbitrary and capricious.

Furthermore, ED's characterization of the pamphlet as presenting "findings" by "the ABA," 84 Fed. Reg. at 49841 (JA1370), represents either a misunderstanding or a misrepresentation of the document—a further indication of arbitrary and capricious decisionmaking. *See*, *e.g.*, *Mashpee Wampanoag Tribe v. Bernhardt*, 466 F. Supp. 3d 199, 229 (D.D.C. 2020) (vacating agency action as arbitrary and capricious where it was based on mischaracterization of the nature of a report). The ABA Section of Dispute Resolution is a group of alternative dispute resolution

---

[3] Contrary to the district court's statement that "Plaintiff does not explain why ED could not reasonably extrapolate from the challenged sources," SPA18, NYLAG explicitly made these points below, *see* Dist. Ct. Dkt. 39 at 28; Dist. Ct. Dkt. 70 at 12–13.

professionals. *See* Am. Bar Ass'n, Section of Dispute Resolution, "Section Membership," https://www.americanbar.org/groups/dispute_resolution/membership/. A promotional pamphlet written by a group of professional arbitrators and mediators discussing the benefits of arbitration is not an objective "finding" of the ABA, as ED made it out to be. For this reason as well, ED's reliance was misplaced and the resulting decision was arbitrary and capricious.

As to eliminating the class-action waiver condition, ED invoked "concern" that the availability of class action lawsuits would "benefit the wrong individuals, that is … lawyers and not wronged students," 84 Fed. Reg. at 49844 (JA1373–74). ED provided no support for this concern, and it appeared to base its concern solely on an article about mass tort and securities class actions. *Id*. (citing James R. Copland, et al., *Class Actions and Mass Torts*, Trial Lawyers, Inc. 2016, Manhattan Institute (2016) (JA278)). ED did not explain how criticism of lawyers handling other kinds of cases was relevant to the student borrower context—which it was required to do, particularly because it had explained in 2016 that such criticism was inapplicable. *See* 81 Fed. Reg. at 76026 (JA113) (stating that it found no evidence that "class actions benefit lawyers more

than consumers" in litigation concerning post-secondary education). ED was required to acknowledge and explain the inconsistency of its conflicting positions.

ED also reversed its 2016 position that "class actions have significant effects beyond financial recovery for the particular class members, including deterring misconduct by the institution, deterring misconduct by other industry members, and publicizing claims of misconduct that law enforcement authorities might otherwise have never been aware of, or may have discovered only much later." *Id.* In the 2016 Rule, ED explained that it "expect[ed] that the potential exposure to class actions will motivate institutions to provide value and treat their student consumers fairly in order to reduce the likelihood of suits in the first place," citing specific examples. *Id*. In 2019, ED's only explanation for abandoning this position was that it was "possible" that institutions that changed their practices after class actions were brought against them did so for other reasons, "regardless of whether students had been able to bring class actions." JA1371. Such cursory speculation is insufficient to justify ED's reversal, particularly in light of the extensive record evidence in support of the 2016 position. *See*, *e.g.*, Legal Aid Comment, JA457–58;

60

Comment of Ams. for Fin. Reform Ed. Fund, JA333–34; New Am. Comment, JA823–24.

Throughout its discussion of arbitration and class actions, ED repeatedly referred to the concept of choice, explaining that the "government does not know what is best for a particular student." 84 Fed. Reg. at 49845 (JA1374). But while increasing consumer choice may be a valid policy goal, both the record and ED's 2016 findings make clear that allowing Title IV recipients to use mandatory pre-dispute arbitration agreements and class-action waivers *reduces* consumer choice. Notably, the 2016 Rule allowed students and schools to enter into *post*-dispute arbitration agreements, explaining that such agreements allow an "informed choice by the student," 81 Fed. Reg. at 76030 (JA117)—a fact that ED ignored in 2019. *See also* New Am. Comment, JA822–23. But as ED explained in 2016, there is no such thing as "informed choice" in the context of pre-dispute agreements; it is "unrealistic to expect the students to understand what arbitration is and thus what they would be relinquishing by agreeing to arbitrate," and there is "no realistic way to improve this awareness." 81 Fed. Reg. at 76028 (JA115). Thus, ED concluded that there was no reason to believe that "predispute

61

agreements to arbitrate will result in well-informed choices, particularly by students in the sector of the market in which such agreements are most commonly used." *Id*. ED did not acknowledge or explain its changed conclusion that disclosure requirements would allow for well-informed choices. *See* 2019 Rule, 84 Fed. Reg. at 49845 (JA1374).

The district court stated that the "2018 Rulemaking record shows that … ED was drawing a different conclusion from the evidence and adopting a different policy." SPA19. But an agency may not rest a policy change on the simple assertion that it is "drawing a different conclusion"; rather, it is obligated to provide a reasoned explanation for disregarding facts and circumstances that underlay the prior policy. *Fox*, 556 U.S. at 516. ED did not do so, and thus it failed to engage in reasoned decisionmaking.

## II. The district court abused its discretion in declining to vacate the defensive statute of limitations provision.

The APA instructs courts to "hold unlawful and set aside agency action" that they find to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(C). As the D.C. Circuit has explained, "[a]n 'agency action' may be either 'the whole or a part of an agency rule [or] order." *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019)

(quoting 5 U.S.C. § 551(13)). "Thus, the APA permits a court to sever a rule by setting aside only the offending parts of the rule." *Id.*; *see also Catholic Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994); *New York v. U.S. Dep't of Lab.*, 477 F. Supp. 3d 1, 18 (S.D.N.Y. 2020).

Here, despite finding that the application of the statute of limitations provision, 34 C.F.R. § 685.206(e)(6), to defensive claims was not a logical outgrowth of the proposed rule and thus unlawful, the district court declined to vacate the provision and instead "remanded to ED for further proceedings." SPA22. The court's opinion, however, shows that the court failed to consider severance and vacatur of only the invalid provision, and mistakenly assumed that the only remedial options were vacatur of the 2019 Rule in its entirety or not at all. This mistaken view of the law reflects an abuse of discretion.

"When a court encounters statutory or regulatory text that is 'invalid as applied to one state of facts and yet valid as applied to another,' it should 'try to limit the solution to the problem' by, for instance, enjoining the problematic applications 'while leaving other applications in force.'" *NRDC v. Wheeler*, 955 F.3d 68, 81–82 (D.C. Cir. 2020) ((quoting *Ayotte v. Planned Parenthood of N. New England*, 546

U.S. 320, 328–29 (2006)). Here, the application of § 685.206(e)(6) to defensive claims "may be dropped" as "what is left is fully operative as a law," and there is no "evidence that [ED] would not have enacted" the remainder of the 2019 Rule absent that provision. *United States v. Smith*, 945 F.3d 729, 738 (2d Cir. 2019).

That the district court failed to consider severability is clear from its application of the two-factor test set forth by the D.C. Circuit in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993). Under that test, a court considers "[1] [the] seriousness of the action's deficiencies and [2] the likely disruptive consequences of vacatur." SPA22 (quoting *NRDC v. EPA*, No. 19 Civ. 5174, 2020 WL 2769491, at *1 (S.D.N.Y. Apr. 15, 2020)). As to the first factor, the district court incorrectly identified the "action" as the 2019 Rule as a whole, rather than the invalid provision. On that basis, it concluded that vacatur was inappropriate because "summary judgment [was] granted only as to the three-year statute of limitations on defensive claims, while the vast majority of the 2019 Rule remain[ed] untouched." SPA22. The court made the same error as to the second factor, stating "vacatur of the 2019 Rule"

64

would cause "some degree of disruption to students asserting borrower defenses under the rule currently in place." *Id.*

When these same factors are properly applied to the provision held unlawful, vacatur becomes the clearly appropriate remedy. On the first factor, "deficient notice is a fundamental flaw that almost always requires vacatur." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (quotation omitted). Accordingly, courts have consistently found that a regulatory provision that is not a logical outgrowth of a proposed rule is sufficiently deficient to warrant vacatur of that provision. *See*, *e.g.*, *Allina Health*, 746 F.3d at 1102; *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013); *Council Tree Commc'ns, Inc. v. FCC*, 619 F.3d 235, 258 (3d Cir. 2010); *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1083 (D.C. Cir. 2009); *Chamber of Commerce of U.S. v. SEC*, 443 F.3d 890, 9090 (D.C. Cir. 2006). As to the second factor, vacatur of the offending provision would cause no disruption to borrowers or anyone else. Eliminating a statute of limitations for student borrowers could not negatively impact borrowers. To the contrary, if the provision is *not* vacated, there is a significant risk

that student borrowers will have their claims subjected to an unlawful limitations period.

Since the unlawful provision applies to "loans first disbursed on or after July 1, 2020," 34 C.F.R. § 685.206(e), student borrowers could have their defensive claims extinguished as soon as July 2023 absent vacatur of that provision. Given that ED has failed to take any action with respect to this provision since the district court's March 2021 opinion, it is unlikely ED would be able to complete a new rulemaking in time to eliminate this harm. ED's borrower defense rulemakings are lengthy endeavors. The 2019 Rule, which governed loans issued beginning July 2020, began with a notice of intent issued in June 2017. *See* ED, Notice, Intent to establish negotiated rulemaking committees, 82 Fed. Reg. 27640 (June 16, 2017). The 2016 Rule, which did not take effect until October 2018, began with a notice of intent issued in August 2015. ED, Notice, Intent to establish negotiated rulemaking committee, 80 Fed. Reg. 50588 (Aug. 20, 2015).

Accordingly, the district court erred in declining to sever and vacate the application of 34 C.F.R. § 685.206(e)(6) to defensive claims.

## CONCLUSION

For the foregoing reasons, this Court should (1) reverse the district court's entry of judgment on NYLAG's fourth cause of action, (2) reverse the district court's order as to remedy for the unlawful defensive statute of limitations provision, and (3) remand to the district court with instructions to order entry of judgment in NYLAG's favor and to vacate the Rule.

Respectfully submitted,

/s/ Adam R. Pulver

Eileen M. Connor
PROJECT ON PREDATORY STUDENT
  LENDING, LEGAL SERVICES CENTER
  OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003

Adam R. Pulver
Adina H. Rosenbaum
PUBLIC CITIZEN
  LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-7790
apulver@citizen.org

July 21, 2021

*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief complies with the typeface and volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(5), (a)(6), and (a)(7)(B) and Local Rule 32.1(a)(4) as follows: The proportionally spaced typeface is 14-point Century Schoolbook and, as calculated by my word processing software (Microsoft Word for Office 365), the brief contains 12,991 words, exclusive of those parts of the brief not required to be included in the calculation by Federal Rule of Appellate Procedure 32(f) and the rules of this Court.

<u>/s/ Adam R. Pulver</u>
Adam R. Pulver