# 21-888

*To Be Argued By*:
TOMOKO ONOZAWA

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 21-888

◆━━◆◆◆▶

NEW YORK LEGAL ASSISTANCE GROUP,

*Plaintiff-Appellant,*

—v.—

MIGUEL A. CARDONA,
in his official capacity as Secretary of Education,
and UNITED STATES DEPARTMENT OF EDUCATION,

*Defendants-Appellees.*

───────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for Defendants-Appellees.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2721

JENNIFER C. SIMON,
TOMOKO ONOZAWA,
BENJAMIN H. TORRANCE,
  *Assistant United States Attorneys,*
    *Of Counsel.*

**TABLE OF CONTENTS**

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . .  2

Issues Presented for Review . . . . . . . . . . . . . . . . . . .  2

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  Procedural History . . . . . . . . . . . . . . . . . . . .  3

    B.  Statutory and Regulatory Framework . . . .  4

        1.  The Higher Education Act and the
Direct Loan Program . . . . . . . . . . . . . . .  4

        2.  1994 Regulations . . . . . . . . . . . . . . . . . .  5

        3.  The 2016 Regulations . . . . . . . . . . . . . .  7

        4.  2019 Regulations . . . . . . . . . . . . . . . . . .  8

            a.  Negotiated Rulemaking
Committee and the NPRM . . . . . . .  8

            b.  The Final 2019 Regulations . . . . . .  9

    C.  District Court Decision . . . . . . . . . . . . . . .  13

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . .  14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

POINT I—The Court Lacks Jurisdiction over
This Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

ii

PAGE

POINT II—The 2019 Regulations Are Not
Arbitrary or Capricious................... 20

    A.  Standard of Review.................... 21

    B.  ED Reasonably Justified Its Changes to
the Borrower Defense Regulations ...... 22

        1.  Definition of Misrepresentation and
Documentation Requirement ....... 23

        2.  Financial Harm ................... 32

        3.  Group Claims .................... 36

        4.  Arbitration and Class
Action Waivers................... 40

    C.  ED Reasonably Justified Its Rule
Regarding Closed School Discharges and
Related Disclosures ................... 45

POINT III—The District Court Properly
Remanded the Limitations-Period
Provision to the Agency................... 49

    A.  Standard of Review.................... 49

    B.  The District Court Did Not Abuse Its
Discretion in Remanding the Limitations-
Period Provision to the Agency ......... 49

CONCLUSION ............................... 52

iii

## TABLE OF AUTHORITIES

*Cases*:

*Allied-Signal, Inc. v. NRC,*
　988 F.2d 146 (D.C. Cir. 1993). . . . . . . . . . . . . 50, 51

*Allina Health Services v. Sebelius,*
　746 F.3d 1102 (D.C. Cir. 2014). . . . . . . . . . . . . . 14

*American Great Lakes Ports Ass'n v. Schultz,*
　962 F.3d 510 (D.C. Cir. 2020). . . . . . . . . . . . . 19, 49

*American Hawaii Cruises v. Skinner,*
　893 F.2d 1400 (D.C. Cir. 1990). . . . . . . . . . . . . . 17

*American Textile Manufacturers*
　*Institute, Inc. v. Donovan,*
　452 U.S. 490 (1981). . . . . . . . . . . . . . . . . . . . . . . 43

*Ashmore v. CGI Grp., Inc.,*
　860 F.3d 80 (2d Cir. 2017) . . . . . . . . . . . . . . . . . 18

*Bauer v. DeVos,*
　332 F. Supp. 3d 181 (D.D.C. 2018) . . . . . . . . . . . 7

*Black Warrior Riverkeeper v.*
　*U.S. Army Corps of Eng'rs,*
　781 F.3d 1271 (11th Cir. 2015) . . . . . . . . . . . . . . 50

*Central & SW Services, Inc. v. EPA,*
　220 F.3d 683 (5th Cir. 2000) . . . . . . . . . . . . . . . 50

*City & County of San Francisco v. USCIS,*
　944 F.3d 773 (9th Cir. 2019) . . . . . . . . . . . . . . . 23

iv

PAGE

*CompuCredit Corp. v. Greenwood*,
565 U.S. 95 (2012). . . . . . . . . . . . . . . . . . . . . . . . . 41

*County of Westchester v. HUD*,
802 F.3d 413 (2d Cir. 2015) . . . . . . . . . . . . . . . . 21

*Crocco v. Xerox Corp.*,
137 F.3d 105 (2d Cir. 1998) . . . . . . . . . . . . . . . . 17

*DHS v. Regents of the University of California*,
140 S. Ct. 1891 (2020). . . . . . . . . . . . . . . . . . . . . . 21

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016). . . . . . . . . . . . . . . . . . . 26, 32

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009). . . . . . . . . . . . . . . . . . . . . . 22, 26

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021). . . . . . . . . . . . . . . . . . . 21, 22

*Fischer v. New York State Dep't of Law*,
812 F.3d 268 (2d Cir. 2016) . . . . . . . . . . . . . . . . 16

*Fund for Animals v. Kempthorne*,
538 F.3d 124 (2d Cir. 2008) . . . . . . . . . . . . . . . . 43

*Gelboim v. Bank of America Corp.*,
574 U.S. 405 (2015). . . . . . . . . . . . . . . . . . . . . . . . 18

*Henrietta D. v. Giuliani*,
246 F.3d 176 (2d Cir. 2001) . . . . . . . . . . . . . . . . 19

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) . . . . . . . . . . . . . . . . 50

*Karpova v. Snow*,
497 F.3d 262 (2d Cir. 2007) . . . . . . . . . . . . . . . . 21

v

PAGE

*In re Long-Distance Telephone Service*
    *Federal Excise Tax Refund Litigation,*
    751 F.3d 629 (D.C. Cir. 2014) . . . . . . . . . . . . . . . 19

*Mead v. Reliastar Life Ins. Co.,*
    768 F.3d 102 (2d Cir. 2014) . . . . . . . . . . . . . 17, 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*
    *State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . 22

*National Ass'n of Home Builders v. Norton,*
    325 F.3d 1165 (9th Cir. 2003) . . . . . . . . . . . . . . 18

*Nebraska Dep't of Health & Human Servs. v. HHS,*
    435 F.3d 326 (D.C. Cir. 2006) . . . . . . . . . . . . . . . 49

*New York v. FERC,*
    783 F.3d 946 (2d Cir. 2015) . . . . . . . . . . . . . . . . 22

*North Carolina Fisheries Ass'n v. Gutierrez,*
    550 F.3d 16 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . 17

*Northern Air Cargo v. U.S. Postal Service,*
    674 F.3d 852 (D.C. Cir. 2012) . . . . . . . . . . . . 49, 51

*NRDC v. EPA,*
    808 F.3d 556 (2d Cir. 2015) . . . . . . . . . . . . . . . . 50

*Perales v. Sullivan,*
    948 F.2d 1348 (2d Cir. 1991) . . . . . . . . . . . . . . . 17

*Petrello v. White,*
    533 F.3d 110 (2d Cir. 2008) . . . . . . . . . . . . . . . . 18

*Pueblo of Sandia v. Babbitt,*
    231 F.3d 878 (D.C. Cir. 2000) . . . . . . . . . . . . . . . 17

vi

PAGE

*Richardson-Merrell Inc. v. Koller*,
  472 U.S. 424 (1985). . . . . . . . . . . . . . . . . . . . . . . . 17

*Safari Club Int'l v. Salazar*,
  709 F.3d 1 (D.C. Cir. 2013). . . . . . . . . . . . . . . . 22

*Stringfellow v. Concerned Neighbors in Action*,
  480 U.S. 370 (1987). . . . . . . . . . . . . . . . . . . . . . . 18

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951). . . . . . . . . . . . . . . . . . . . . . . 22

*USA Group Loan Services v. Riley*,
  82 F.3d 708 (7th Cir. 1996) . . . . . . . . . . . . . . . . . 5

*Vera v. Republic of Cuba*,
  802 F.3d 242 (2d Cir. 2015) . . . . . . . . . . . . . . . . 17

*Western Oil & Gas Ass'n v. EPA*,
  633 F.2d 803 (9th Cir. 1980) . . . . . . . . . . . . . . . 50

*Statutes*:

20 U.S.C. § 1087. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

20 U.S.C. § 1087a . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

20 U.S.C. § 1087e . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Rules*:

Fed. R. Civ. P. 54(b) . . . . . . . . . . . . . . . . . . . . . . . . . 18

vii

PAGE

*Regulations*:

34 C.F.R. § 668.71 . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

34 C.F.R. § 685.206 . . . . . . . . . . . . . . . . . . . . *passim*

34 C.F.R. § 685.214 . . . . . . . . . . . . . . . . . . . . . . . . . . 6

34 C.F.R. § 685.222 . . . . . . . . . . . . . . . . . . . . . . . . . . 23

59 Fed. Reg. 61,664 (Dec. 1, 1994) . . . . . . . . . . . . . . 5

81 Fed. Reg. 39,330 (June 16, 2016) . . . . . . . . . . . . . 7

81 Fed. Reg. 75,926 (Nov. 1, 2016) . . . . . . . . . . *passim*

82 Fed. Reg. 27,640 (June 16, 2017) . . . . . . . . . . . . . 8

82 Fed. Reg. 41,194 (Aug. 30, 2017) . . . . . . . . . . . . . 8

83 Fed. Reg. 6458 (Feb. 14, 2018) . . . . . . . . . . . . . . . 7

83 Fed. Reg. 37,242 (July 31, 2018) . . . . . . . . . *passim*

84 Fed. Reg. 49,788 (Sept. 23, 2019) . . . . . . . . . *passim*

86 Fed. Reg. 43,609 (Aug. 10, 2021) . . . . . . . . . . . . . 20

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 21-888

───────────

NEW YORK LEGAL ASSISTANCE GROUP,

*Plaintiff-Appellant,*

—v.—

MIGUEL A. CARDONA, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF EDUCATION, AND
UNITED STATES DEPARTMENT OF EDUCATION,

*Defendants-Appellees.*

───────────

## BRIEF FOR DEFENDANTS-APPELLEES

───────────

### Preliminary Statement

In 2019, the United States Department of Education ("ED" or "the agency") made changes to its regulations governing the defenses student borrowers may raise against the repayment of federal student loans. In doing so, the agency exercised the policymaking discretion given to it by Congress and justified its changes by explaining, among other things, that the prior regulations were expensive for taxpayers and imposed significant burdens on educational institutions.

2

The district court, for the most part, upheld the agency's action, but remanded one aspect of the 2019 rule. Because that remanded agency proceeding is still pending, there has not been a final disposition of the challenge to the rule, and this Court lacks jurisdiction. But if this appeal were properly before this Court, the district court correctly held that ED's policy changes were well within its authority and were not arbitrary and capricious. The challenge to the 2019 regulations rests on the New York Legal Assistance Group's ("NYLAG's") preference for the policies reflected in the previous iteration of the borrower-defense regulations. But a federal administrative agency is not permanently bound to the rules it adopts. ED adequately explained why it decided to change course, and its 2019 regulations should be upheld.

## Jurisdictional Statement

The district court had subject matter jurisdiction under 28 U.S.C. § 1331, as the action arose under the laws of the United States. The district court entered a judgment remanding to the agency on March 19, 2021 (Special Appendix ("SPA") 23), and NYLAG filed a timely notice of appeal on April 7, 2021 (Joint Appendix ("JA") 1544). However, as explained below (Argument Point I), this Court lacks jurisdiction over this appeal, as there has been no final, appealable decision of the district court.

## Issues Presented for Review

1. Whether this Court has jurisdiction over this appeal.

3

2. Whether ED's promulgation of the 2019 regulations, in whole or in part, was arbitrary and capricious.

3. Whether, in light of the district court's determination that the provision establishing a limitations period on borrower claims raised in response to debt collection activity ("defensive claims") was not a logical outgrowth of the notice of proposed rulemaking, the district court abused its discretion when it remanded the matter to the agency for further consideration without vacating the provision.

### Statement of the Case

### A. Procedural History

On February 19, 2020, NYLAG filed suit in district court challenging the 2019 regulations, asserting that various aspects of those regulations are arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), that a three-year limitations period applicable to defensive claims was not a logical outgrowth of the notice of proposed rulemaking, and that there were procedural defects in the manner in which the agency conducted its rulemaking. (JA 1463). The parties each sought summary judgment. (JA 7, 10). On March 17, 2021, the district court (Lorna G. Schofield, J.) issued a memorandum and order granting NYLAG's motion for summary judgment as to its challenge to the limitations period for defensive claims and denying it as to all other claims; and granting ED's cross-motion for summary judgment as to all other claims. (SPA 1). It entered judgment on March 19, 2021. (SPA 23). On April 7, 2021, NYLAG filed a notice of appeal.

4

## B. Statutory and Regulatory Framework

### 1. The Higher Education Act and the Direct Loan Program

Under the William D. Ford Federal Direct Loan Program, ED provides federal loans directly to eligible borrowers, who use the funds to pay a student's costs of attendance at a participating institution of higher education. 20 U.S.C. § 1087a. If a borrower defaults in repaying the loan, ED pursues collection from the borrower. However, under Title IV of the Higher Education Act of 1965 ("HEA"), ED is required to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under" the Direct Loan Program. 20 U.S.C. § 1087e(h). And if a student "is unable to complete the program in which such student is enrolled due to the closure of the institution . . . then the Secretary shall discharge the borrower's liability on the loan." 20 U.S.C. § 1087(c).

More generally, the Secretary has broad authority to "make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department." *Id*. § 1221e-3. In exercising that authority with regard to the federal student financial aid programs under Title IV of the HEA, ED must typically utilize negotiated rulemaking. *Id*. § 1098a(b)(2). "Participants in the negotiations process shall be chosen by the Secretary" and must include "individuals and representatives of the groups involved in student financial assistance programs under this subchapter,

such as students, legal assistance organizations that represent students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies." *Id.* § 1098a. The Secretary is further required to "select individuals with demonstrated expertise or experience in the relevant subjects under negotiation, reflecting the diversity in the industry, representing both large and small participants, as well as individuals serving local areas and national markets." *Id.* § 1098a(b)(2). The HEA "does not envisage that the negotiations will end in a binding contract." *USA Group Loan Services v. Riley*, 82 F.3d 708, 715 (7th Cir. 1996). Rather, the statute "simply creates a consultative process in advance of the more formal arms' length procedure of notice and comment rulemaking." *Id.*

### 2. 1994 Regulations

In accordance with its authority under the HEA, ED first promulgated regulations governing defenses to repayment in 1994. 59 Fed. Reg. 61,664 (Dec. 1, 1994). The 1994 regulations specified that "[i]n any proceeding to collect on a Direct Loan, the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." *Id.* at 61,696; 34 C.F.R. § 685.206(c) (1994). If a student successfully asserted a borrower defense and received a discharge of the student loan, the 1994 regulations provided that the agency "may initiate an appropriate proceeding to require the school whose act or omission resulted in the

6

borrower's successful defense against repayment of a Direct Loan to pay to the Secretary the amount of the loan to which the defense applies." *Id.* The regulations did not expressly provide for affirmative claims (i.e., claims made other than in response to collection activity) by students; rather, the regulations provided only that the student would be able to assert a defense to a collection proceeding. *Id.*

As for institutions that closed, the 1994 regulations provided that "[t]he Secretary discharges the borrower's . . . obligation to repay a Direct Loan . . . if the borrower . . . did not complete the program of study for which the loan was made because the school at which the borrower . . . was enrolled closed." 34 C.F.R. § 685.214(a)(1) (2014). To qualify for such a discharge, a student was required to submit a written statement to the agency attesting to the fact that the borrower received the loan to attend a school, that the borrower did not complete the program of study at that school because the school closed, and did not complete the program of study through a teach-out (that is, a plan that gives the student an opportunity to complete the program in some manner at another school) or by transferring academic credits or hours earned at the closed school to another school. *Id.* § 685.214(c). ED could also require the borrower to produce additional documentation to demonstrate that the borrower met the qualifications for a closed school loan discharge. *Id.* § 685.214(c)(3). The 1994 regulations did not provide for automatic closed school discharges. *Id.* § 685.214(c).

### 3. The 2016 Regulations

Although the regulations governing closed school discharges were amended in the interim, the 1994 regulations governing borrower defenses remained unchanged for over two decades. In May 2015, a large nationwide for-profit institution, Corinthian Colleges, filed for bankruptcy. *See* ED, Notice of Proposed Rulemaking, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 39,330, 39,335 (June 16, 2016). Citing the resulting borrower defense claims, which highlighted "difficulties in application and interpretation of the current State law standard, as well as the lack of clarity surrounding the procedures that apply for borrower defense," and "the growth of the proprietary higher education sector" more generally, ED began rulemaking on the topic of borrower defenses to repayment, with final regulations published on November 1, 2016. 81 Fed. Reg. 75,926 (Nov. 1, 2016).

The 2016 final regulations were scheduled to go into effect on July 1, 2017. *Id.* at 75,927. However, ED delayed that implementation, citing pending court challenges, and later published a final rule delaying the regulations' effective date until July 1, 2019. 83 Fed. Reg. 6458 (Feb. 14, 2018). Those delays were, in turn, challenged in litigation, and in 2018 the federal district court in Washington, D.C., vacated ED's delays. The 2016 regulations thus went into effect on October 16, 2018. *Bauer v. DeVos*, 332 F. Supp. 3d 181,

8

183 (D.D.C. 2018); *Bauer v. DeVos*, No. 17 Civ. 1330, Minute Order (D.D.C. Oct. 12, 2018).

### 4. 2019 Regulations

#### a. Negotiated Rulemaking Committee and the NPRM

While the above lawsuits were pending, on June 17, 2017, ED announced its intent to establish a negotiated rulemaking committee to revise the regulations on borrower defenses to the repayment of federal student loans. 82 Fed. Reg. 27,640 (June 16, 2017). In a later notice, ED indicated that it anticipated that the committee would discuss regulations on topics including borrower defenses, the definition of misrepresentation as it pertains to borrower defenses, closed school discharges, arbitration, and class action lawsuits. 82 Fed. Reg. 41,194, 41,195 (Aug. 30, 2017); 83 Fed. Reg. 37,242, 37,248 (July 31, 2018). The negotiators included representatives from legal assistance organizations, as well as student representatives. 83 Fed. Reg. at 37,249.

During the negotiated rulemaking sessions, which took place over several days in late 2017 and early 2018, the negotiators debated the appropriate definition of misrepresentation, 83 Fed. Reg. at 37,256, the evidentiary standard that should be applied to borrower defenses to repayment claims, *id.* at 37,258, the financial harm requirement, *id.* at 37,259, whether to impose time limits on a borrower's ability to assert a borrower defense to repayment and possible time periods for such limits, *id.* at 37,260, the requirements related to pre-dispute arbitration agreements and class

9

action waivers, *id.* at 37,265, and automatic closed school discharges, *id.* at 37,267-68. The negotiators, however, did not reach a consensus on the proposed regulations.

On July 31, 2018, ED published a notice of proposed rulemaking. 83 Fed. Reg. 37,242 (July 31, 2018) (the "2018 NPRM"). The agency also solicited comments on every substantive aspect of the proposed rule. More than 38,450 comments were submitted.

### b.    The Final 2019 Regulations

On September 23, 2019, the agency published final regulations amending Parts 668, 682, and 685, of Title 34 of the C.F.R., including the borrower defense regulations. *See* 84 Fed. Reg. 49,788.

In publishing the 2019 regulations, the agency stated that its regulatory objectives were to:

> Provide students with a balanced, meaningful borrower defense to repayment claims process that relies on a single, Federal standard;

> Grant borrower defense to repayment loan discharges that are adjudicated equitably, swiftly, carefully, and fairly;

> Encourage students to directly seek remedies from schools when acts or omissions by the school, including those that do not support a borrower defense to repayment claim, fail to provide a student access to the educational or job placement

10

opportunities promised, or otherwise
cause harm to students;

Ensure that schools, rather than tax-
payers, bear the burden of billions of dol-
lars in losses from approvals of borrower
defense to repayment loan discharges;

Establish that the Department has a
complete record to review in adjudicating
claims by allowing schools to respond to
borrower defense to repayment claims
and provide evidence to support their re-
sponses;

Discourage schools from committing
fraud or other acts or omissions that con-
stitute misrepresentation;

Encourage closing institutions to en-
gage in orderly teach-outs rather than
closing precipitously;

Enable the Department to properly
evaluate institutional financial risk in or-
der to protect students and taxpayers;

Eliminate the inclusion of lawsuits as
a trigger for letter of credit requirements
until those lawsuits are settled or adjudi-
cated and a monetary value can be accu-
rately assigned to them;

Provide students with additional time
to qualify for a closed school loan dis-
charge and protect students who elect
this option at the start of a teach-out,

11

> even if the teach-out exceeds the length of the regular lookback period;
>
> Adjust triggers for Letters of Credit to reflect actual, rather than potential, liabilities; and
>
> Reduce the strain on the government, and the delay to borrowers in adjudicated valid claims, due to large numbers of borrower defense to repayment applications.

84 Fed. Reg. at 49,789-90.

In pursuit of these policy objectives, the 2019 regulations revised the federal standard for borrower defenses to repayment, as well as the process for the assertion and resolution of claims. 84 Fed. Reg. at 49,790. Among other things, the rule establishes a new definition of a misrepresentation as it relates to borrower defense claims, requiring "a statement, act, or omission by an eligible school to a borrower that is false, misleading, or deceptive; that was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth; and that directly and clearly relates to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made." 34 C.F.R. § 685.206(e)(3). Thus, unlike the 2016 regulations, the 2019 regulations do not contemplate that an inadvertent error by the school could give rise to a borrower defense to repayment. 84 Fed. Reg. at 49,804. The 2019 regulations also provide greater opportunities for schools and borrowers to provide evidence and arguments when a defense to repayment application has

12

been filed by a borrower, including providing for an op-
portunity for each side to respond to the other's sub-
missions. 84 Fed. Reg. at 49,790. In addition, the reg-
ulations require the borrower to provide evidence to
the agency regarding the financial harm he or she in-
curred as a result of the misrepresentation. 34 C.F.R.
§ 685.206(e)(4); 84 Fed. Reg. at 49,790.

The 2019 regulations also addressed the responsi-
bility and financial liability of schools for losses in-
curred by the agency through the discharge of loans
based on a borrower defense to repayment. 84 Fed.
Reg. at 49,790. The 2019 regulations continue to re-
quire institutions to take responsibility for the repay-
ment of amounts discharged by ED pursuant to the
borrower defense to repayment, closed school dis-
charge, false-certification discharge, and unpaid-re-
fund discharge regulations. 84 Fed. Reg. at 49,791.
Unlike the 2016 regulations, the 2019 regulations do
not limit the use of class action waivers or mandatory
arbitration agreements by institutions, but instead re-
quire that such schools make a plain language disclo-
sure of those requirements prior to enrollment to stu-
dents and include information about those require-
ments in a borrower's entrance counseling. 84 Fed.
Reg. at 49,790.

With respect to closed school loan discharges, the
2019 regulations eliminate the automatic discharge
provisions of the 2016 regulations, in favor of requiring
an application by the individual borrower and extend-
ing the time for a borrower to qualify for a closed school
discharge. The regulations also provide that students
who accept a teach-out plan to complete their educa-

13

tional programs at another school will only qualify for a closed school discharge if the school fails to meet the material terms of the teach-out plan. *Id.*

Finally, the 2019 regulations establish a three-year limitations period, from the date borrowers complete their educations, for borrower defense claims. 84 Fed. Reg. at 49,822-24. While the 2018 NPRM had proposed such a limitations period only for affirmative claims, the final rule extended it to defensive claims as well. *Id.*; 34 C.F.R. § 685.206(e)(6).

## C.   District Court Decision

On March 17, 2021, the district court entered an opinion and order, granting NYLAG summary judgment as to its claim that the limitations period on defensive borrower claims was not a logical outgrowth of the proposed rulemaking, but otherwise granting ED summary judgment on all remaining claims. (SPA 1-22).

As relevant to the issues now on appeal, the district court granted ED summary judgment on NYLAG's claim that the promulgation of the 2019 regulations as a whole, and certain separate provisions, was arbitrary and capricious. The district court concluded that "much of [NYLAG's] argument . . . simply reflects a competing view of the appropriate policies for student loan defenses," and that NYLAG's arguments "represent [its] interpretation of the record evidence and the appropriate responsive rulemaking and are not appropriate grounds for finding ED's rulemaking arbitrary and capricious." (SPA 15).

14

As noted above, with respect to NYLAG's claim that the limitations period on defensive borrower claims was not a logical outgrowth of the proposed rulemaking, the district court granted NYLAG summary judgment. (SPA 13). However, applying the two-factor analysis set forth in *Allina Health Services v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014), the district court determined that remand, rather than vacatur, was the appropriate remedy.

## Summary of Argument

At the threshold, this appeal should be dismissed for lack of appellate jurisdiction. The district court's order remanded the matter to the agency for further proceedings. That order was therefore not a final determination and is not appealable. Even though the district court resolved some claims in favor of ED, appellate review of those rulings must await a final order. And the district court's order is not made final by its directive to close the case. Because the district court directed further agency proceedings, which in fact have begun, this Court lacks jurisdiction to review its order. *See infra* Point I.

If the Court decides it has jurisdiction, it should affirm the district court's decision under the deferential standard of the APA. ED reasonably explained the rule it adopted in 2019, and it considered its departures from the policies reflected in the 2016 rule. NYLAG's challenge is a reflection of its disagreement with the policy choices reflected in the agency's 2019 rule. ED addressed the definition of a "misrepresentation" that may be the basis for a borrower defense claim and

15

determined that a scienter requirement, mandating that the school know of or recklessly disregard the falsity of its statement, was appropriate to protect schools and prevent excessive burdens on the taxpayers who bear the cost of discharged loans. The agency also encouraged borrowers to submit written documentation that may demonstrate a misrepresentation, though the agency stated it would still consider evidence of verbal misrepresentations; it also mandated that schools have a chance to respond to evidence of misrepresentations. None of that is unreasonable. *See infra* Point II.B.1.

In the 2019 regulations, ED also required that borrowers show financial harm to assert a defensive claim, extending and refining the prior requirement that borrowers demonstrate a detriment. The agency reasonably explained that the new requirement will protect taxpayers and prevent unsubstantiated claims. *See infra* Point II.B.2. ED also determined it would no longer adjudicate group claims, which, the agency stated, are inconsistent with the individualized showings necessary for borrower defense claims and are burdensome on the agency. *See infra* Point II.B.3. ED decided to eliminate the limitations on the use of mandatory arbitration agreements and class action waivers by participating institutions, recognizing the federal policy favoring arbitration and its benefits of speedier and less adversarial determinations, and the inefficiency of class actions. *See infra* Point II.B.4. And ED determined it would no longer provide automatic closed school loan discharges for borrowers because requiring individual applications is not burdensome, and the new policy would further the agency's goal of

encouraging students to complete their educations at other institutions. *See infra* Point II.C.

Finally, the district court's decision to remand the limitations-period provision governing defensive claims to the agency for further consideration, as opposed to vacating the provision, was within its discretion. The district court considered the rulemaking as a whole and recognized that the limitations period was only one small piece. Its decision not to vacate that provision was reasonable in light of the possibility that the agency could reimplement the limitations period. *See infra* Point III.

## A R G U M E N T

### POINT I

### The Court Lacks Jurisdiction over This Appeal

At the threshold, this appeal should be dismissed because this Court lacks jurisdiction. The district court ordered the matter remanded to ED "for further proceedings." (SPA 22). Such a remand order is not a final, appealable decision that this Court has jurisdiction to review.

Under 28 U.S.C. § 1291, only final decisions of the district courts are appealable. That requirement embodies Congress's "'preference that some erroneous trial court rulings go uncorrected until the appeal of a final judgment, rather than having litigation punctuated by piecemeal appellate review of trial court decisions which do not terminate the litigation.'" *Fischer v. New York State Dep't of Law*, 812 F.3d 268, 273 (2d

17

Cir. 2016) (quoting *Richardson-Merrell Inc. v. Koller*, 472 U.S. 424, 430 (1985); some quotation marks omitted); *accord Vera v. Republic of Cuba*, 802 F.3d 242, 246 (2d Cir. 2015) (noting "strong congressional policy —embodied in 28 U.S.C. § 1291—against piecemeal reviews" (quotation marks omitted)). An appealable final decision is "one that conclusively determines the pending claims of all the parties to the litigation, leaving nothing for the court to do but execute its decision." *Mead v. Reliastar Life Ins. Co.*, 768 F.3d 102, 109 (2d Cir. 2014) (quotation marks omitted).

In contrast, "a district court's remand to an administrative agency is not ordinarily appealable." *Crocco v. Xerox Corp.*, 137 F.3d 105, 108 (2d Cir. 1998); *accord Perales v. Sullivan*, 948 F.2d 1348, 1353 (2d Cir. 1991); *North Carolina Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 19 (D.C. Cir. 2008) ("It is black letter law that a district court's remand order is not normally 'final' for purposes of appeal under 28 U.S.C. § 1291."). Rather than resolving the dispute, a remand order "simply turns it back for further proceedings by the agency, after which it may well return [to court] again." *American Hawaii Cruises v. Skinner*, 893 F.2d 1400, 1403 (D.C. Cir. 1990). The rule against appeal of remand orders "best serves the interests of judicial economy and efficiency" because it "avoids the prospect of entertaining two appeals, one from the order of remand and one from entry of a district court order reviewing the remanded proceedings." *Pueblo of Sandia v. Babbitt*, 231 F.3d 878, 880 (D.C. Cir. 2000).

The same rule applies even though the district court granted summary judgment to the agency on all

18

but one of NYLAG's claims. *National Ass'n of Home Builders v. Norton*, 325 F.3d 1165, 1167 (9th Cir. 2003) (where plaintiffs challenged two related agency decisions "as a single action," and the district court remands one to the agency, "a Rule 54(b) certification is required" to appeal, in accordance with the "general rule that remand orders are not considered final" (quotation marks omitted)). When a party presents multiple claims to a district court in one action, it may not appeal the district court's resolution of some of those claims until a final decision has been entered as to all of them. *Petrello v. White*, 533 F.3d 110, 113 (2d Cir. 2008) (appealable final judgment "conclusively determines all pending claims of all the parties"). As an exception to that rule, a district court may enter partial judgment as to some claims after it "expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b); *see Gelboim v. Bank of America Corp.*, 574 U.S. 405, 409 (2015) (noting that Rule 54(b) "relaxes" the requirement of the final-decision rule that all claims must be decided before an appeal, to avoid possibly unjust delays); *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 377 (1987) ("unless the district court specifically holds otherwise, challenges to this type of order can be raised only after judgment"); *Ashmore v. CGI Grp., Inc.*, 860 F.3d 80, 87-88 & n.6 (2d Cir. 2017); *Petrello*, 533 F.3d at 113. But the district court did not do so here. Accordingly, there is no final appealable judgment.

NYLAG argues that the district court's decision is appealable because "the district court directed the clerk of court to close the case, and there is no evidence of the court's intent to retain jurisdiction or any

19

contemplation of further proceedings." (Br. 3). But a "district court's directive to 'close the case' and its subsequent entry of a separate 'judgment' does not alter the conclusion that the [decision] is not final." *Mead*, 768 F.3d at 111. Similarly, "nothing turns on the district court's broad pronouncement that [j]udgment is entered . . . . Appealability turns on what has been ordered, not on how it has been described." *Henrietta D. v. Giuliani*, 246 F.3d 176, 181 (2d Cir. 2001) (quotation marks omitted).

Finally, although NYLAG relies on *American Great Lakes Ports Ass'n v. Schultz* in support of its argument that this Court has jurisdiction, the D.C. Circuit in that case expressly noted that the remand order under review in that matter did not instruct the agency to "conduct further proceedings." 962 F.3d 510, 515 (D.C. Cir. 2020). Here, in contrast, the district court directed that "[t]his matter is remanded to ED for further proceedings consistent with this Opinion and Order." (SPA 22). Thus, the judgment of the district court did not "conclusively determine[] the pending claims of all the parties to the litigation," *Mead*, 768 F.3d at 109, but rather remanded the matter to the agency for proceedings related to the limitations period governing defensive claims. Similarly, the court in *In re Long-Distance Telephone Service Federal Excise Tax Refund Litigation* allowed an appeal following a district court remand, observing that the agency to which the issue was remanded had not taken action, had no reason to take action, and did not plan to take action regarding further proceedings. 751 F.3d 629, 633 (D.C. Cir. 2014). But in this case, in accordance with the district court's direction, ED has already taken action, as it

20

has initiated the process of negotiated rulemaking relating to the borrower defense regulations encompassing the time-limitation provision. 86 Fed. Reg. 43,609, 43,610 (Aug. 10, 2021).[1] While NYLAG contends that the present appeal is its "only opportunity . . . to challenge the district court's order" (Br. 5-6 (quotation marks omitted)), it may seek judicial review after the agency has completed proceedings on remand. In sum, because the district court's order did not finally dispose of the challenge to the regulations, this Court lacks jurisdiction, and NYLAG's appeal should be dismissed.

## POINT II

### The 2019 Regulations Are Not Arbitrary or Capricious

If this Court concludes it has jurisdiction, it should affirm the district court's holdings that the borrower defense and closed school regulations are not arbitrary and capricious. In promulgating the 2019 regulations, ED transparently laid out its regulatory objectives, articulated the basis for its decisions, and specifically explained its reasons for rejecting alternatives, including those embodied in the 2016 regulations. The 2019

──────────

[1]   The issue of the defensive statute of limitations is mentioned in ED's Issue Paper #6, available at https://go.usa.gov/xM6UX and made available to the participants in the October 2021 negotiated rulemaking session. As noted in that Issue Paper, the Agency is considering "removing any limitations periods."

regulations were based upon consideration of the relevant factors and a balancing of the interests of students seeking discharge of their debts, completion of their educations, and accurate information to inform their decisions; taxpayers who otherwise would bear the cost of repayment discharges; institutions in being able to respond to claims; and the government in addressing large numbers of borrower defense claims. 83 Fed. Reg. at 37,244 (noting the 2019 regulations reflect the agency's efforts to "very carefully . . . balance relief for borrowers who have been harmed by acts of institutional wrongdoing, with its obligation to the taxpayer to provide reliable stewardship of Federal dollars"). ED acted reasonably and within the scope of its authority, and the district court correctly ruled that the agency's regulations should be upheld.

## A. Standard of Review

This Court reviews de novo a district court's grant of summary judgment involving APA claims. *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007). Under the APA, "a reviewing court must uphold agency action unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *County of Westchester v. HUD*, 802 F.3d 413, 430-31 (2d Cir. 2015) (quoting 5 U.S.C. § 706(2)(A)). "Under this narrow standard of review, a court is not to substitute its judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *DHS v. Regents of the University of California*, 140 S. Ct. 1891, 1905 (2020) (citations and quotation marks omitted); *accord FCC v.*

22

*Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) ("deferential" review "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision"); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Thus, "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Moreover, "competing views about policy" between the agency and those challenging a regulation do not give rise to a claim under the APA. *Safari Club Int'l v. Salazar*, 709 F.3d 1, 3 (D.C. Cir. 2013); *accord Prometheus*, 141 S. Ct. at 1158 ("a court may not substitute its own policy judgment for that of the agency").

## B.  ED Reasonably Justified Its Changes to the Borrower Defense Regulations

NYLAG alleges that the agency's explanations for its 2019 changes were "irrational and unsupported by the record." (Br. 28). But NYLAG's objections are nothing more than policy disagreements—NYLAG would balance the various considerations differently, but that does not oblige the agency to follow its lead. *See New York v. FERC,* 783 F.3d 946, 959 (2d Cir. 2015) ("[W]e may not displace an agency's 'choice between two fairly conflicting views, even though we would justifiably have made a different choice had the matter been before us *de novo.*'" (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); alterations

23

omitted)); *City & County of San Francisco v. USCIS*, 944 F.3d 773, 799 (9th Cir. 2019) ("And whether the change in policy results from changing circumstances or a change in administrations, the wisdom of the policy is not a question we can review."). The agency adequately and reasonably justified the changes it made to the four parts of the borrower defense regulations that NYLAG now challenges, and the district court was correct to uphold them.

### 1. Definition of Misrepresentation and Documentation Requirement

Under the 2016 regulations, a borrower defense claim required a "substantial misrepresentation" by the educational institution. 34 C.F.R. § 685.222(d)(1) (2018); *see* 84 Fed. Reg. at 49,805. A "substantial misrepresentation" included a statement that had "the likelihood or tendency to mislead under the circumstances," including statements that omit information in a "false, erroneous or misleading" way." 34 C.F.R. § 668.71(c) (2016). And a "statement" could include "any communication made in writing, visually, orally, or through other means." *Id*.

To ensure that "a school should not be held liable if it committed an inadvertent mistake," which would "place[ ] well-performing schools at risk unnecessarily, potentially limiting postsecondary opportunities for students or increasing costs," the 2019 regulations added a "scienter requirement" and excluded "negligent misrepresentation" from the type of statement that could provide the basis for a borrower defense claim. 84 Fed. Reg. at 49,804. The Department

24

recognized that it was effecting a "marked departure" from the 2016 definition, but determined that a "more stringent definition of misrepresentation better guards the interests of all students, including an institution's future tuition-paying students, an institution acting in good faith, and the Federal taxpayer who, in some cases, inevitably must pay for any negligent or innocent mistakes." *Id.* at 49,805. The agency also concluded that the 2016 definition "would unnecessarily chill productive communication between institutions and prospective and current students," "create legal risks that dissuade schools from putting helpful and important information in writing or allowing other students and faculty to share their opinions with prospective or current students," and "subject an institution, and its current, past, and future students, to liability and reputational harm for innocent or inadvertent misstatements." *Id.*

Thus, for the purpose of a borrower defense claim, the final rule defined "misrepresentation" to mean a material "statement, act, or omission by an eligible school to a borrower that is false, misleading, or deceptive" and "that was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth." 34 C.F.R. § 685.206(e)(3).[2] The

––––––––––

[2] Such a misrepresentation may be made "by a school's employee who acts without the school's knowledge or against the school's direction as long as the borrower demonstrates they reasonably relied on the misrepresentation under the circumstances." 84 Fed. Reg. at 49,808.

25

rule sets out a non-exhaustive list of examples of evidence that may establish a misrepresentation, such as material differences between actual licensure or employment rates and those represented in a school's communications to the public or to the student. *Id.*; 84 Fed. Reg. at 49,809-10 (describing examples). The agency also recognized that "misrepresentations can be made verbally," and stated that it will "consider borrower defense claims in which the only evidence is the claim by the borrower that an institution's representative said something years prior"—but also recognized the difficulty of "determin[ing] whether a representative of an institution made a verbal misrepresentation to a borrower several years after the fact." 84 Fed. Reg. at 49,807. Thus, "a borrower may submit a sworn affidavit in support of the borrower defense application," and that evidence will be considered alongside rebuttal evidence submitted by the school. *Id.* at 49,817.

In short, ED provided a detailed explanation of the agency's proposal, recognizing and justifying the differences with the 2016 standard. The agency also thoroughly evaluated numerous comments on its proposals and provided a detailed and reasonable explanation of the agency's rationale for the changes it was making in the final rule. As ED explained, pointing to "its responsibility to the Federal taxpayer," the new standard for a misrepresentation reflects its efforts to "strike[ ] a balance between protecting borrowers by establishing a standard of evidence that is reasonable for a borrower to meet and protecting the Federal taxpayer by requiring a level of evidence that ensures misrepresentation actually took place and the student

relied upon that misrepresentation and suffered harm." 83 Fed Reg. at 37,257.

That is enough for the agency to justify its change in policy. An agency changing its position " 'need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.' " *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). While an agency must " 'display awareness that it is changing position' and 'show that there are good reasons for the new policy,' " agencies remain "free to change their existing policies as long as they provide a reasoned explanation for the change." *Id.* (quoting *Fox Television*, 556 U.S. at 515).[3] The agency, with its express recognition of its departures from the 2016 regulations and its detailed explanations of its reasoning, met that standard.

NYLAG's challenges thus fail. At the outset, NYLAG incorrectly describes the 2019 regulation. It maintains that in defining a misrepresentation for

––––––––––

[3] The Court in *Encino Motorcars* also noted that where "longstanding policies may have engendered serious reliance interests that must be taken into account . . . a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* (quotation marks and citations omitted). But that is not the case here (nor does NYLAG contend otherwise), given that the 2016 regulations were in effect for less than a year.

27

borrower defense purposes, ED imposed an "intent requirement" under which a borrower must show a school's intent to deceive or mislead the student. (Br. 32-34). But there is no such requirement: ED stated clearly that it "will not require a borrower to demonstrate that the institution acted with specific intent to deceive." 84 Fed. Reg. at 49,807. The agency recognized, just as it had in the 2016 rulemaking, "that it is unlikely that a borrower would have evidence to demonstrate that an institution acted with intent to deceive." *Id*. at 49,803; *accord id.* at 49,806-07 ("final regulations do not require that a defense to repayment be approved only when evidence demonstrates that a school made a misrepresentation with the intent to induce the reliance of the borrower on the misrepresentation" because "it is unlikely that a borrower would have evidence . . . to demonstrate that an institution acted with intent to deceive"); *see* 83 Fed. Reg. at 37,257. In short, NYLAG challenges an intent requirement that the agency explicitly disavowed. And NYLAG insists that this nonexistent intent requirement represents a "flip-flop" from the agency's 2016 reasoning, where it recognized the difficulty of requiring a borrower to prove intent—but in fact the agency expressly agreed with that reasoning. 83 Fed. Reg. at 37,257 ("[a]s was the case in the 2016 final regulations," agency not proposing intent requirement); 84 Fed. Reg. at 49,806-07 ("[a]s in the 2016 final regulations, these final regulations do not require" evidence of intent).

As for the scienter requirement the agency in fact adopted—that to constitute a misrepresentation, a "statement, act, or omission" by an educational

28

institution must be made "with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth," 34 C.F.R. § 685.206(e)(3)—ED explained the reasoning behind that rule. As described above, the agency determined that a scienter requirement of this type, while a change from the 2016 regulation, was advisable to ensure that schools would not be made liable for inadvertent misstatements. 84 Fed. Reg. at 49,804-05. As for the ability of students to prove a school's knowledge, ED noted that "[i]t is difficult to prove what an officer's or employee's intent is, but it is not as difficult to prove that a statement was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth." *Id*. at 49,803. By way of example, the agency pointed out that "a student may demonstrate that an officer of the institution or employee misrepresented the actual licensure passage rates because the employee's representations are materially different from those included in the institution's marketing materials, website, or other communications made to the student." *Id*. Indeed, ED included that and similar examples in the regulatory text itself to demonstrate how a student could prove a misrepresentation. 34 C.F.R. § 685.206(e)(3). The agency's newly adopted scienter requirement was therefore adequately explained, and did not contradict ED's earlier conclusion that intent would be difficult to prove. (*Contra* Br. 34).

Similarly, NYLAG misstates the meaning of the regulation in its challenge to a supposed "documentation requirement." (Br. 32 (quotation marks omitted)). Due to ED's concerns that "[i]t can be difficult to determine whether a representative of an institution made

29

a verbal misrepresentation to a borrower several years after the fact," ED "encourage[d] borrowers to obtain and preserve written documentation of any information—including records of communications, marketing materials, and other writings—that they receive from a school that they rely upon when making decisions about their education." 84 Fed. Reg. at 49,807; *accord id.* at 49,817-18 ("any finder of fact, including the Department as an adjudicator of borrower defense claims, is ill-equipped, many years after the fact, to make determinations based solely on one party's statement"). However, nothing in the regulation precludes a borrower from asserting a defense to repayment without documentary support.

To the contrary, ED stated it "will consider borrower defense claims in which the only evidence is the claim by the borrower that an institution's representative said something years prior." 84 Fed. Reg. at 49,807. In response to concerns about the difficulty of establishing a misrepresentation based on only the borrower's word, rather than preclude a borrower from offering that testimony, the agency opted to ensure that the school had an opportunity to respond to and offer evidence in rebuttal—a procedure that, the agency noted, is also consistent with basic principles of due process. *Id.* at 49,805 (contrasting 2019 regulation with 2016 regulation, which "did not guarantee that the school would be allowed to respond to a borrower defense to repayment claim"), 49,817 ("a borrower may submit a sworn affidavit," the school may respond with evidence, and ED will consider "all the evidence presented"). ED also pressed students to "obtain, review, and retain written materials provided by

the school," and to "seek a written explanation to clar-
ify any discrepancies" between written and oral state-
ments, but still affirmed that "if the student is told in-
formation materially different than the information
provided in writing, the Department will consider the
evidence of the alleged verbal misrepresentation." *Id*.
at 49,818.

Moreover, NYLAG appears to misunderstand the
types of documents that are relevant: while NYLAG
observes that students may lack the power to "force in-
stitutions to put their representations in writing"
(Br. 35), the examples in the regulation suggest that a
student can establish a misrepresentation by pointing
to a school's "marketing materials, website, or other
communications." 34 C.F.R. § 685.206(e)(3). The
agency further explained that the procedure it was
adopting was appropriate for a decision with "signifi-
cant financial consequences not just for borrowers, but
for institutions, current and future students, and tax-
payers who ultimately will bear the costs if there are
high volumes of discharges," and that allowing a dis-
charge based on the borrower's unsupported state-
ment "could increase the likelihood that future stu-
dents will bear the cost of prior students' borrower de-
fense claims in the form of increased tuition." 84 Fed.
Reg. at 49,817. Taken together, these statements show
that the agency acknowledged its change in position
from the 2016 regulation, and reasonably explained it.
Nothing more was required.

Instead of addressing these reasoned explanations,
NYLAG points to ED's statements that some of its pro-
posed changes would " 'help[ ] borrowers become more

educated consumers.'" (Br. 33 (quoting 84 Fed. Reg. at 49,817)).[4] But simply isolating, then disputing, an agency rationale is not enough to establish that the agency did not provide a reasoned explanation for its change in course. ED relied on a variety of reasonable explanations, and NYLAG's challenge to one of those reasons cannot demonstrate that the agency acted arbitrarily. In any event, ED's invocation of concerns related to borrower responsibility was properly within the scope of its policymaking authority. NYLAG contends that there is no evidence that "widespread deceptive conduct by predatory institutions resulting in massive amounts of student debt . . . is caused by students failing to take responsibility" (Br. 35), but ED never drew that causal line, and in fact repeatedly recognized in the 2019 rulemaking that "[b]orrowers should be protected against misrepresentations made by institutions that result in financial harm to them." 84 Fed. Reg. at 49,817. But the agency, acting within its discretion and expertise to consider all aspects of a

_____

4 NYLAG also cites ED's statement that its changes were "'appropriate so that borrowers shop wisely, take personal responsibility for seeking the best information available and make informed choices.'" (Br. 33 (quoting 84 Fed. Reg. at 49,817)). Notably, however, that statement was made as part of the agency's explanation for abandoning a clear-and-convincing evidence standard for misrepresentations that it had proposed in the 2018 NPRM and adopting instead a more borrower-friendly preponderance standard—a decision NYLAG does not now challenge.

32

regulatory problem, and more particularly to balance the interests of students, schools, and the government, properly emphasized the need for students to carefully consider "the sizeable investment one makes in a college education" and to seek out accurate and valid information before making educational decisions and accepting loans that they are legally obligated to repay. *Id*. at 49,816-17. The agency's rebalancing of policy considerations is not an unexplained departure from prior positions as NYLAG would have it, and is therefore not arbitrary and capricious. *See Encino Motorcars*, 136 S. Ct. at 2125-27 (agency need only explain it has "good reasons" for a policy change (quotation marks omitted)).

## 2. Financial Harm

ED's inclusion of a financial harm requirement in the borrower defense regulations was also permissible and reasonable. Under the 2019 regulations, "defense to repayment relief is limited to instances where a school's misrepresentation resulted in quantifiable financial harm to the borrower"—"[i]f a misrepresentation associated with the making of a loan did not result in any such harm, it would not qualify as a basis for a defense to repayment under these final regulations." 84 Fed. Reg. at 49,819. ED explained that this requirement again reflects the agency's "interest in balancing the need to protect both borrowers and Federal taxpayers." 83 Fed. Reg. at 37,259; *see* 84 Fed. Reg. at 49,819 (observing that "such disappointments [as to a student's college experience or career] are not the institution or the taxpayer's responsibility"). The agency defined financial harm to mean "the amount of monetary

33

loss that a borrower incurs as a consequence of a misrepresentation," excluding nonmonetary losses (such as emotional distress or opportunity costs) as well as losses caused by employment market conditions or a student's voluntary decision not to pursue work or fulltime work. 34 C.F.R. § 685.206(e)(4). However, ED recognized unemployment, or inability to obtain employment in a particular field, as evidence of financial harm, as well as overcharged tuition and fees. *Id*.

The agency described the relationship of this financial harm requirement to the 2016 regulation: under the latter, to assert a borrower defense claim, borrowers had to show they relied on a misrepresentation to their "detriment." 83 Fed. Reg. at 37,259; *see* 81 Fed. Reg. at 75,951. Accordingly, under the 2016 rule, "'a borrower may be subject to a substantial misrepresentation, but because the education provided full or substantial value, no relief may be appropriate.'" 84 Fed. Reg. at 49,819 (quoting 81 Fed. Reg. at 75,975); *accord id.* (noting that under the 2016 regulations, where a "borrower reasonably relied on a misrepresentation" but "still received the value that she expected, . . . no relief is appropriate"). The 2019 regulation refined and replaced that "detriment" standard with the "financial harm" requirement, but also noted that no "'specific level of financial harm'" would be required for a student to be eligible for relief. 84 Fed. Reg. at 49,820 n.88 (quoting 83 Fed. Reg. at 37,259-60). By requiring evidence of financial harm, the agency acted to deter "unsubstantiated claims or those generally beyond the scope of borrower defense to repayment." 84 Fed. Reg.

34

at 49,819.[5] As ED further explained, without a re-
quirement of harm, many borrowers could base a de-
fense to repayment merely on a "claim made by an in-
stitution about the potential a student could realize by
enrolling at the institution."[6] *Id*.

_____

    [5] NYLAG disagrees with the agency's view that
tightening the standards for borrower defense claims
would deter frivolous claims. (Br. 28-30). But the fi-
nancial harm requirement provides an example: the
requirement itself may discourage those who lack any
proof of financial harm from submitting claims. And
even if those claims are not deterred, the agency's bur-
den is reduced because they can be denied based on the
determination that the borrower offered no proof of fi-
nancial harm or of knowledge of the falsity of the mis-
representation. NYLAG may disagree with that logic,
but it was neither unsupported nor arbitrary.

    [6] NYLAG suggests that adoption of a financial
harm requirement is inconsistent with the agency's
prior rejection of a "damages" requirement. (Br. 38).
But in the 2016 rulemaking, ED did not refuse to con-
sider financial harm; rather, it declined to use "the
term 'damages'" as it was not "appropriate in the con-
text of borrower defense, because the Department is
limited by statute to providing relief to the borrower
on his or her Direct Loan and may not provide a bor-
rower with the complete amount or types of compensa-
tion that might traditionally be considered to be dam-
ages at law." 81 Fed. Reg. at 75,951.

NYLAG's arguments again amount to disagreement with the agency's policy choices. NYLAG maintains that there is no evidence that borrowers file borrower defense claims based on their "disappointment" or buyer's remorse regarding their educational choices. (Br. 39). But it was a reasonable policy choice for ED to limit borrower defense claims—which, if successful, would impose the cost of the discharged loan on taxpayers—to those where the borrower suffered actual harm. Indeed, in the 2016 rulemaking, ED understood its "responsibility to protect the interests of Federal taxpayers as well as borrowers," and that "when losses from borrower defenses may be borne by the taxpayer," it is appropriate for the agency, even "when a borrower defense based in misrepresentation has been established," to limit the borrower's defense claim by considering the value of the education she received. 81 Fed. Reg. at 75,974. ED's similar limitation in 2019, achieved by requiring and defining an actual financial harm for a defense claim to succeed, was not arbitrary and capricious.

Nor, contrary to NYLAG's argument, did ED ignore the collateral consequences of debt or default. (Br. 37-38). Indeed, the agency expressly acknowledged those harms—but at the same time, recognized that the administrative relief it is authorized to provide is limited to the loan itself, and the fact that the cost of that relief will typically fall not on the school that made the misrepresentation, but on the taxpayer. 84 Fed. Reg. at 49,818. ED thus limited borrower defense relief to those students who can show financial harm, while noting that borrowers may still seek to recover damages or other remedies in courts or other venues. *Id.*

36

That decision was reasonable and reasonably explained, and therefore NYLAG's challenge must fail.

### 3. Group Claims

The exclusion of the group claims process from the 2019 regulations was also neither arbitrary nor capricious. The 2016 regulations "enable[d] the Department to initiate affirmative claims on behalf of entire groups of borrowers, if the Secretary determines that there are common facts and claims that apply to the group." 83 Fed. Reg. at 37,244. But in the 2019 rulemaking, ED exercised its policy discretion to remove this provision.

As the agency explained, a group claims process is no longer appropriate in light of the new definition of misrepresentation and the new requirement of financial harm, each of which requires an individualized, fact-specific inquiry. 84 Fed. Reg. at 49,799. The misrepresentation definition depends on an institution's knowledge of the falsity, or reckless disregard of the truth, of its statements, and the financial harm will be specific to each student. *Id*. In particular, even where a group of borrowers "assert[s] [a] misrepresentation on the part of the same school based on the same facts and circumstances, such as when the student borrowers were enrolled in a program that the school advertised to the public as being fully accredited by a specific programmatic accrediting agency when, in fact, it was not so accredited, . . . [ED] would still need to determine that the borrower made a decision based on the misrepresentation, that the borrower was harmed by the misrepresentation, and to what, if any, amount

of or type of relief the borrower is entitled." 83 Fed. Reg. at 37,262-63. Thus, a case-by-case inquiry is required. 84 Fed. Reg. at 49,799; *accord id.* at 49,879 (group claims process "has the potential of providing loan forgiveness to borrowers who were not subject to a misrepresentation, did not make a decision based on the misrepresentation, or did not suffer financial harm as a result of their decision"); 83 Fed. Reg. at 37,244. On the other hand, the Department reserved the discretionary ability to "determine it is more efficient to establish facts regarding claims of misrepresentation put forth by a group of borrowers." 83 Fed. Reg. at 37,262-63.

In addition, the agency changed its position for reasons that included its assessment that the group discharge process established under the 2016 regulations imposed administrative burdens on the agency that could lead to "inefficiency and delays for individual borrowers." 84 Fed. Reg. at 49,879. Further, the agency explained that the potential for discharging loans of students who "were not subjected to the misrepresentation, did not rely on a misrepresentation to make an enrollment decision, or were not harmed by the misrepresentation" could burden the taxpayer with unnecessary debt. 83 Fed. Reg. at 37,285.[7] And

---

[7] Relatedly, the agency noted that it had "conducted further analyses of the tens of thousands of defense to repayment applications for Corinthian students that the Department has received to date" and observed that "students enrolled at Corinthian who submitted defense to repayment applications may not

38

the agency was concerned that "[b]ecause an institu-
tion can refuse to provide an official transcript for a
borrower whose loan has been forgiven, group dis-
charges could render some borrowers unable to verify
their credentials or work in the field for which they
trained and have enjoyed employment." *Id.* at 37,244;
*see* 84 Fed. Reg. at 49,879.

Before this Court, NYLAG disagrees with the rea-
soned explanations offered by the agency and instead
argues that "ED failed to meaningfully consider the
benefits of the group claims process." (Br. 41). But ED
expressly and carefully considered comments assert-
ing that the group claims process reduces the burden
on individual students and potentially permits a
quicker resolution of claims. ED acknowledged those
possible benefits, but concluded that "it is prudent to
balance the need for speedy recovery for students
against the need to properly resolve each claim on the
merits and provide relief in relation to the claimant's
harm." 84 Fed. Reg. at 49,799. ED also expressly re-
jected the assertion that it was too burdensome for in-
dividual students to assert claims by providing indi-
vidualized documentation or completing individual ap-
plications for relief—particularly when those students
had already signed promissory notes and otherwise

---

all have been harmed to the same extent." 83 Fed. Reg.
at 37,244. By requiring individualized evaluation of
each claim, the agency indicated its expectation that
the process would thereby provide "fair and equal ac-
cess to defense to repayment relief." *Id.*

39

applied for financial aid.[8] *Id.* That NYLAG disagrees
with ED's prioritization of competing policy objectives
does not render the regulations arbitrary or capricious.

NYLAG also asserts that the agency relied on "un-
specified 'evidence of outside actors attempting to per-
sonally gain from the bad acts of institutions,' as a rea-
son to eliminate the group claims process," and argues
that the agency failed to "identify these actors or ex-
plain how the group resolution of administrative
claims . . . allowed them to 'personally gain' in ways
that individual claims would not." (Br. 44). According
to NYLAG, "[n]o evidence in the record shows that
anyone manipulated the group claims process created
by the 2016 Rule, or even that ED employed the pro-
cess at all." (Br. 44-45). But the agency did not base its
decision regarding group claims solely on the conclu-
sion that there were outside actors attempting to fi-
nancially benefit from the bad acts of institutions. Ra-
ther, in response to a comment that outside actors
could attempt to monetize borrower defense claims to
their own benefit, ED merely observed that it had

---

8   NYLAG suggests that ED's logic is flawed be-
cause a promissory note "requires a borrower to pro-
vide no more than a signature." (Br. 43). That both
minimizes the responsibilities a signer of a promissory
note has and takes ED's reasoning out of context: the
agency did not rely merely on the promissory note, but
on the preparation and submission of several docu-
ments to obtain a student loan. The burden of applying
for a discharge is, ED stated, comparatively similar. 84
Fed. Reg. at 49,799.

"already become aware of evidence of[ ] outside actors attempting to personally gain from the bad acts of institutions as well as unfounded allegations." 84 Fed. Reg. at 49,798. As the district court noted, this statement "does not alter ED's other expressed justifications, supported by the record and discussed during the rulemaking, for the change." (SPA 17). Nor does NYLAG's selection of quotations from other contexts to support its insistence that a "speculative theory" about bad actors was "a major force behind the rule" (Br. 45)—to the contrary, in the portion of the rulemaking concerning group claims, the actions of unscrupulous outsiders are only a small part of the agency's discussion. 84 Fed. Reg. at 49,798. NYLAG's assertion that this language negates the principal reasons for the elimination of the group claims process is without merit.

Ultimately, the decision by ED to remove the group discharge process that had been established by the 2016 regulations rested on a reasoned explanation for the agency's policy objective—namely, to adjudicate borrower defense claims based on a fact-specific inquiry taking into account, among other things, the harm suffered by a particular borrower. *Id.* Therefore, that policy decision should not be disturbed by the Court.

## 4. Arbitration and Class Action Waivers

Finally, the agency's decision not to limit the use of class action waivers and mandatory arbitration agreements by institutions, as long as appropriate

41

disclosures are made to potential student borrowers, was also not arbitrary or capricious.

As ED reasoned, "[a]rbitration is often a more efficient and less adversarial means of dispute resolution than time-consuming and expensive litigation that may result in borrowers waiting years to obtain a fair hearing and any relief, [and] may also allow borrowers to obtain greater relief than they would in a consumer class action case." 83 Fed. Reg. at 37,245. Thus, ED concluded that "arbitration may reduce the expense of litigation that a university would otherwise pass on to students in the form of higher tuition and fees." 83 Fed Reg. at 37,245. The agency also pointed to the American Bar Association's citation of arbitration's "significant advantages over a court proceeding, including: Party control over the process; typically lower cost and shorter resolution time; flexible process; confidentiality and privacy controls; awards that are fair, final, and enforceable; qualified arbitrators with specialized knowledge and experience; and broad user satisfaction." 84 Fed. Reg. at 49,841. Lastly, the agency explained that the 2019 changes to the rule "bring [ED's] policies to align more closely with the 'liberal federal policy favoring arbitration agreements.'" *Id.* at 49,840 (quoting *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012)).

The agency considered concerns about the disadvantages of arbitration, including actions by "unscrupulous schools" to use arbitration agreements to discourage claims, hide misconduct, and prevent disclosure of evidence to students. *Id.* at 49,840-41. ED concluded that the best response to those issues was to

"ensure a regulatory framework that requires that students have sufficient notice of whether the school mandates arbitration and to allow the student to decide whether to enroll at that institution or another." *Id*. at 49,841. By doing so, the agency intended to promote "the ability of students to make informed, freely chosen decisions regarding how they spend their education dollars, time, and efforts," and ensures that students "who are concerned about the fairness of such a process have the power to reject a forced arbitration clause by taking their financial aid dollars to institutions that do not mandate internal dispute processes, arbitrations, or bar class actions." *Id*. But the agency considered and disagreed with the view that arbitration agreements are "inherently 'unfair,'" in particular noting that arbitration may "provide more speedy recovery and potentially greater relief to students impacted by the institutions' alleged conduct, as determined by an experienced legal professional as factfinder." *Id*. at 49,841-42.

NYLAG's objections to these provisions again center on policy disagreements. It first contends that in departing from the 2016 rule, "ED did not mention that it previously found such provisions to be financially harmful to taxpayers." (Br. 53). But the harm to taxpayers discussed in the 2016 rulemaking concerned the use of mandatory arbitration to avoid publicity regarding a school's misconduct. 81 Fed. Reg. at 76,022. The 2019 rulemaking considered that concern and concluded that "[i]nstitutions will continue to be held accountable" through borrower defense claims, which are not precluded by an arbitration agreement. 84 Fed. Reg. at 49,842. Overall, there remain "sufficient

43

opportunities to review an institution, conduct oversight, and sanction an institution appropriately." *Id.*

More broadly, the agency acknowledged that it had changed course based on its "reweighing of the issue and subsequent legal developments." 83 Fed. Reg. at 37,265. That reassessment of the benefits and disadvantages of arbitration is not impermissible. *Fund for Animals v. Kempthorne*, 538 F.3d 124, 132 (2d Cir. 2008) ("'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence'" (quoting *American Textile Manufacturers Institute, Inc. v. Donovan*, 452 U.S. 490, 523 (1981))). Contrary to NYLAG's criticism (Br. 54), the agency did not disregard the potential disadvantages of arbitration to students. Rather, ED acknowledged those problems but ultimately determined that arbitration also offered benefits to both students and schools, which outweighed the negatives.

Moreover, the agency's more general assessment of arbitration was based on a reasoned judgment. It was reasonable for the agency to look to information regarding analogous situations, such as the use of arbitration in commercial disputes or class actions in the mass tort context. Not only was it reasonable for the agency to seek information from experts in the field, NYLAG does not challenge the substance of the information ED relied upon, such as the conclusion that arbitration is ordinarily faster and less expensive than litigation. That NYLAG points to conflicting information from other sources does not render the agency's decision arbitrary and capricious; it merely seeks to

44

substitute NYLAG's policy preferences for the agency's. Nor was there anything improper about ED's citation of the discussion of the benefits of arbitration in a document issued by the ABA—and again, NYLAG does not actually dispute those benefits.[9] As with the rest of the changes ED made from the 2016 rule to the 2019 rule, the agency acknowledged and justified the changes, and its actions in doing so were permissible.

As for no longer limiting class action waivers, ED explained that it was concerned about maximizing the benefit to students: "We are concerned that the adjudication of class action lawsuits benefit the wrong individuals, that is lawyers and not wronged students." 84 Fed. Reg. at 49,844-45. Thus, allowing schools to elect to require class action waivers could "fast-track[ ] dispute resolutions" to be "lower cost and more efficient." *Id*. ED acknowledged but expressly "reject[ed]

---

[9]    NYLAG mischaracterizes ED's discussion of the ABA document. As the agency's rulemaking notice makes clear, ED cited the ABA document as one of several points of support for the widely held view that arbitration offers numerous benefits. 84 Fed. Reg. at 49,841. It did not mischaracterize that view as the ABA's "findings" (Br. 58-59); the only portion of the document for which ED used the word "found" was, reasonably, the statistics regarding the relative speed of arbitral and judicial proceedings. 84 Fed. Reg. at 49,841. NYLAG is entitled to disagree with those who believe arbitration is beneficial, but its disagreement is no basis to reject the agency's discretionary policy-based determination.

45

the suggestion in the 2016 NPRM that class actions against certain institutions would have motivated other institutions to change their practices," instead concluding that "it is possible that many institutions changed their approach in light of allegations made against those certain institutions, including those made by attorneys general, regardless of whether students had been able to bring class actions." 84 Fed. Reg. at 49,842. Those conclusions are reasonable, and within the agency's discretion.

## C. ED Reasonably Justified Its Rule Regarding Closed School Discharges and Related Disclosures

As noted above, the 2016 regulations included provisions that mandated automatic discharges for borrowers whose schools closed and who did not re-enroll in an eligible institution within three years of the closure. *See* 81 Fed. Reg. at 76,038. The 2019 regulations ended this practice in favor of requiring individual student applications in most instances, returning to the system in place under the 1994 regulations. This approach again reflects reasonable policy decisions by the agency and is neither arbitrary nor capricious.

As with the changes discussed above, ED acknowledged its departure from the 2016 rule and provided a reasoned explanation for that decision. 83 Fed. Reg. at 37,267. The agency explained that the change would comport with ED's goal of "encouraging students at closed or closing schools to complete their educational programs, either through an approved teach-out plan, or through the transfer of credits separate from a

46

teach-out." 84 Fed. Reg. at 49,847. The agency reasonably concluded that automatic closed school discharges run counter to that goal. *Id.* In addition, ED noted that it already has "authority to grant a discharge without an application in appropriate cases," and therefore a separate automatic closed school discharge process is not necessary. 83 Fed. Reg. at 37,267. Finally, ED pointed out that a school "might withhold official transcripts of borrowers" who received a closed school discharge, *id.*, and a discharge may have "tax implications," leading to "negative effects on the borrower" from an automatic discharge, 84 Fed. Reg. at 49,848.

In lieu of automatically discharging debt, the 2019 regulations give students three options: to pursue a closed school loan discharge by submitting an application, to transfer to another institution, or to accept the teach-out plan offered by their institution, which may include a teach-out plan offered by the closing institution or a plan from a teach-out partner. 84 Fed. Reg. at 49,846. If a student accepts a teach-out plan offered by the institution, the student is not eligible for a closed school discharge (unless the school fails to materially adhere to the terms of the teach-out plan). *Id.* In pursuing this approach, the agency observed that there "are large costs to institutions and taxpayers when students retain the right to transfer their credits and also receive a closed school loan discharge." *Id.* at 49,848.

The agency also considered the potential burden on student borrowers required to submit an application, concluding it was not sufficiently significant to warrant automatic closed school discharges. Specifically,

47

the agency concluded that "[i]n most cases, to apply for a closed school discharge, an eligible borrower is only required to complete the closed school discharge application form and submit it to the Department." *Id*. The agency also pointed out that the information needed by the agency to make a determination on such an application is limited, as "it is generally not difficult for the Department to make determinations of borrower eligibility for closed school discharges based on the announcement date and enrollment information regarding the borrower." *Id*. at 49,847; *see id*. at 49,854.

Ultimately, while ED recognized that "there may be disagreement about whether automatic closed school loan discharge is better for borrowers than closed school loan discharges provided to students who apply for such a benefit," ED sought to implement a policy whereby "it is incumbent upon the borrower to make the decision as to whether it is in his or her best interest to retain the credits earned at the closed school or receive a closed school loan discharge." 84 Fed. Reg. at 49,848. As the agency explained, its view is that "obtaining the education credential that the borrower wanted to pursue is generally preferable to foregoing credential completion or being required to start a program over at another institution." *Id*. at 49,853. It is therefore "better to create a path for students to finish their degree, certificate, or program, rather than create perverse incentives to stop their schooling, with only a plan for an indeterminate, future starting date." *Id*. Doing so will "provide students enrolled at a closing or closed school as many options as possible for completing their program." *Id*. Nothing about that policy-based exercise of discretion is

48

arbitrary or capricious. NYLAG is thus wrong that ED did not "consider the benefits" of automatic closed school loan discharges. (Br. 48). The agency made clear that it had "consider[ed] all of the relevant factors," and, recognizing "that automatic closed school loan discharges did not exist in our regulations until recently," reasonably concluded that such automatic discharges had not "become such an integral part of the program that it cannot function, and students cannot be served, without inclusion of an automatic discharge provision." 84 Fed. Reg. at 49,848.

NYLAG also challenges changes to the related disclosure requirements, asserting that ED "did not explain why it was wrong to require schools that rely on federal loan money to inform students of their statutory rights when those schools decide to shut down." (Br. 50). But ED did explain, stating that "it is the Department's, not the school's, burden to provide this information to students," 84 Fed. Reg. at 49,847, and indeed that borrowers will have better "access to accurate, up-to-date and complete information by obtaining it from the Department's website," which, unlike closed schools' websites, will continue to operate, *id.* at 49,854.[10] That approach reflects a reasonable policy choice that was adequately explained by the agency.

––––––––––

[10] While no longer requiring it, ED did continue to "encourage schools to post the Department's closed school loan discharge application on their institutional website and to direct their students to the FSA website for further information." 84 Fed. Reg. at 49,854.

49

## POINT III

### The District Court Properly Remanded the Limitations-Period Provision to the Agency

#### A. Standard of Review

The district court's decision whether to vacate, or simply remand, a provision of the rule it determined was unsupported is reviewed for abuse of discretion. *American Great Lakes*, 962 F.3d at 518; *Nebraska Dep't of Health & Human Servs. v. HHS*, 435 F.3d 326, 330 (D.C. Cir. 2006).

#### B. The District Court Did Not Abuse Its Discretion in Remanding the Limitations-Period Provision to the Agency

On the one issue where the district court ruled for NYLAG—the imposition of a limitations period on student defensive claims—the court remanded to ED for further proceedings without vacating the portion of the rule at issue. That was not an abuse of discretion. On the contrary, the district court's decision reflects the judicial policy that favors permitting agencies to remedy their errors.

"When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency." *Northern Air Cargo v. U.S. Postal Service*, 674 F.3d 852, 861 (D.C. Cir. 2012). Whether a court should also vacate the agency action "depends on whether (1) the agency's decision is so deficient as to raise serious doubts whether

50

the agency can adequately justify its decision at all; and (2) vacatur would be seriously disruptive or costly." *Id.* at 860-61 (citing *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)); *accord NRDC v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015) ("'An inadequately supported rule . . . need not necessarily be vacated.'" (quoting *Allied-Signal*, 988 F.2d at 150)). Ultimately, the choice of remanding alone, or vacating and remanding, is left to the court's equitable discretion. *NRDC*, 808 F.3d at 584 ("'when equity demands, the regulation can be left in place while the agency follows the necessary procedures'" (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)); "'A reviewing court has discretion to shape an equitable remedy . . . .'" (quoting *Western Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980))). Remanding a rule without vacatur is "generally appropriate when 'there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so, and when vacating would be 'disruptive.'" *Central & SW Services, Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (quoting *Allied-Signal*, 988 F.2d at 151); *Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) ("where it is not at all clear that the agency's error incurably tainted the agency's decisionmaking process, the remedy of remand without vacatur is surely appropriate").

Here, the district court properly exercised its discretion when it remanded the matter for further proceedings without vacating the portion of the 2019 regulations it determined was unsupported by the notice of proposed rulemaking. The court correctly noted that

51

the limitations period at issue was only one small part of a much larger regulatory endeavor. (SPA 22).[11] And given the remainder of the district court's analysis, which correctly recognized ED's wide policymaking discretion in establishing rules for borrower defense claims, it follows that "there is at least a serious possibility" that the agency could, if it chooses, reimplement the limitations period for such claims. *Allied-Signal*, 988 F.2d at 151. In short, the limitations period was not "so deficient as to raise serious doubts whether the agency can adequately justify its decision at all." *Northern Air Cargo*, 674 F.3d at 860-61. Moreover, the district court was justified in noting that vacating the rule now in place could lead to disruption for students who have asserted borrower defenses under the current regulation. It is reasonable to leave to the agency's discretion the decision of the least disruptive way to make any changes to the limitations period. The district court was entitled to discretion in determining the appropriate remedy, and it did not abuse that discretion.

---------

[11] NYLAG characterizes the district court's focus on the rule as a whole as an "assum[ption] that the only remedial options were vacatur of the 2019 Rule in its entirety or not at all." (Br. 63). But the district court never said it was operating under that or any similar assumption.

52

## CONCLUSION

**The district court's judgment should be affirmed.**

Dated:     New York, New York
           October 20, 2021

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for Defendants-Appellees.*

JENNIFER C. SIMON,
TOMOKO ONOZAWA,
BENJAMIN H. TORRANCE,
    *Assistant United States Attorneys,*
           *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 12,375 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: TOMOKO ONOZAWA,
*Assistant United States Attorney*